854 F.2d 223
 11 Fed.R.Serv.3d 1332
 CITIZENS MARINE NATIONAL BANK, formerly the Citizens
National Bank of Stevens Point, Plaintiff-Appellee,
v.
UNITED STATES DEPARTMENT OF COMMERCE, ECONOMIC DEVELOPMENT
ADMINISTRATION, C. William Verity in his official capacity
as Secretary of Commerce, United States of America, Remer
Hutchinson, and Elaine Hutchinson, Defendants-Appellants.
 Nos. 87-2705, 87-2789.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 22, 1988.
Decided Aug. 8, 1988.
Rehearing Denied Sept. 9, 1988.
 
 Mary K. Doyle, U.S. Dept. of Justice, Washington, D.C., Michael J. Jassak, Habush Habush & Davis, S.C., Milwaukee, Wis., for defendants-appellants.
 Peter L. Gardon, Whyte & Hirschboeck, S.C., Madison, Wis., for plaintiff-appellee.
 Before WOOD, Jr. and POSNER, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 POSNER, Circuit Judge.
 
 
 1
 Citizens Marine National Bank, a bank in Stevens Point, Wisconsin, was owed almost $1 million by a troubled local enterprise, the Weber Tackle Company, as a result of a series of loans that Citizens had made to Weber over the years. In 1979, Mr. and Mrs. Hutchinson bought a controlling interest in Weber, and also loaned the company in excess of $200,000, most of which has never been repaid. Weber's perilous condition did not improve, and in 1981 Weber and the bank sought and obtained from the Economic Development Administration of the U.S. Department of Commerce a guaranty of 90 percent of a new $2.1 million loan by the bank to Weber. The Trade Act of 1974, 19 U.S.C. Secs. 2341 et seq., authorized the Economic Development Administration (we use the past tense because this part of the Act is defunct, having been repealed for reasons well discussed in International Trade Administration Trade Adjustment Assistance: No Cure for Import-Injured Firms (U.S. Dept. of Commerce, Office of Inspector General, Rep. No. D-068-5-006, March 1985)) to provide financial assistance to American firms that had been badly hurt by imports, had "no reasonable access to financing through the private capital market," yet provided "reasonable assurance of repayment of the loan." 19 U.S.C. Secs. 2342(b)(1)(A), 2345. Obviously, "reasonable" here is a term of art, since private financial institutions will happily lend money whenever there is a reasonable assurance of repayment. The Senate Report explains that "reasonable assurance of repayment" "should not be taken to mean reasonable assurance of repayment in the strict banking or commercial sense because adjustment assistance loans are admittedly high risk loans." S.Rep. No. 1298, 93d Cong., 2d Sess. 149 (1974), U.S.Code Cong. & Admin.News 1974, pp. 7186, 7289. Of course plenty of high-risk loans are made in the private sector, but a federal guaranty would reduce the interest rate that the borrower had to pay.
 
 
 2
 At all events, the guaranty agreement between the bank and the Economic Development Administration required the bank to "execute [doubtless a typo for 'exercise'] such care and diligence in the disbursement, servicing, collection and liquidation of the Loan as would be exercised by a reasonable and prudent commercial bank in dealing with a loan of its funds without guaranty," and provided that if the bank "failed to comply with all of the material provisions" of the agreement the government could terminate the guaranty. In connection with the guaranty the Hutchinsons signed two agreements with the bank. In one they guaranteed the $2.1 million loan to Weber but the bank agreed not to enforce the guaranty against the Hutchinsons' home. In the other the bank agreed: (1) Upon payment in full by Weber of the loan guaranteed by the Economic Development Administration, the Hutchinsons--to whom Weber owed almost $200,000--would be entitled to the repayment of their loan, above $50,000, "prior to payment of any other claims or indebtedness owing by [Weber] to the" bank. (2) If Weber was liquidated, the Hutchinsons would be entitled to the repayment of their loan (again, all but $50,000) from the distribution of such assets as the bank might "receive or be entitled to receive on any Junior Indebtedness in connection with any such ... liquidation."
 
 
 3
 The loan was closed in December 1981. Ten months later Weber defaulted; it has since gone out of business. The bank sued Weber in state court, seeking to foreclose on Weber's assets that had secured the loan. Weber responded with a third-party complaint against the government defendants. The basis of that complaint is obscure, but the idea may have been that Weber was a third-party beneficiary of the guaranty agreement and that if the government made good on its loan guaranty to the bank, the bank might ease up on its efforts to seize Weber's assets. At all events, after removal of the case the district court allowed the parties to revamp the litigation: Weber dropped its third-party complaint (and effectively dropped out of the litigation), and the bank filed a complaint against the government--which had announced that it would indeed refuse to make good on its guaranty to the bank. The bank's complaint based jurisdiction on 19 U.S.C. Sec. 2350, which empowers the Secretary of Commerce to sue or be sued, for any amount of money, with respect to claims arising from the Trade Act of 1974, thus enabling this suit to be maintained notwithstanding the Tucker Act. The Tucker Act allows persons having non-tort claims against the United States or its agencies for $10,000 or more to litigate those claims in the Claims Court, so, in the absence of any other statute waiving the sovereign immunity of the United States, that is the only place they may be litigated--but section 2350 is such another statute. Cf. Van Drasek v. Lehman, 762 F.2d 1065, 1071 and n. 10 (D.C.Cir.1985); Munoz v. Small Business Administration, 644 F.2d 1361, 1364 (9th Cir.1981); Pacificorp. v. Federal Energy Regulatory Comm'n, 795 F.2d 816, 826 (9th Cir.1986) (concurring opinion).
 
 
 4
 The bank named as additional defendants the Hutchinsons, who had also guaranteed the loan, and who now counterclaimed against the bank for $150,000, the amount they claimed to be owed by virtue of their second agreement with the bank. This claim is based on state rather than federal law, but the bank contends that it is within the district court's jurisdiction by virtue of the "pendent parties" concept.
 
 
 5
 The district judge granted summary judgment for the bank on its claim against the Hutchinsons, and they appeal. The bank's claim against the government was the subject of a one-day bench trial, after which the judge held that although the bank had behaved imprudently in administering the loan, so had the government, and the bank had not committed a material breach of its obligations under the guaranty and therefore was entitled to judgment (which with interest comes to $3.1 million). The government appeals.
 
 
 6
 There are first some jurisdictional issues to address:
 
 
 7
 1. The original case filed by the bank was not properly removed to the federal district court, for we have held that third-party defendants, including the United States and its agencies, cannot remove (with immaterial exceptions) suits in which the main claim is based on state law. Thomas v. Shelton, 740 F.2d 478 (7th Cir.1984). However, the issue of "removability" was made moot by the filing in the district court of a complaint (by the bank, against the government) that was within the court's original jurisdiction. Graf v. Elgin, Joliet & Eastern Ry., 790 F.2d 1341, 1343 (7th Cir.1986); Bernstein v. Lind-Waldock & Co., 738 F.2d 179, 185-86 (7th Cir.1984).
 
 
 8
 2. The statute under which the bank sued the government lifts the bar of sovereign immunity only for the Secretary of Commerce, and not for the other federal defendants. As no separate relief is sought against the other defendants--indeed, they are as a practical matter synonyms for the Secretary of Commerce (who when sued, as here, in his official rather than personal capacity is merely an alter ego of the United States)--this jurisdictional error is of no consequence. Nevertheless the other defendants should have been dismissed. Cf. Weeks Construction, Inc. v. Oglala Sioux Housing Authority, 797 F.2d 668, 674-75 (8th Cir.1986).
 
 
 9
 3. A more consequential jurisdictional issue relates to the pendent-party claim against the Hutchinsons. Where A (the bank) brings a federal suit, based on federal law, against B (the Secretary of Commerce) and also has a claim under state law against C (the Hutchinsons), we generally allow the district court to exercise jurisdiction over the state-law claim. This is "pendent party" jurisdiction, on which see, e.g., Price v. Pierce, 823 F.2d 1114, 1119 (7th Cir.1987); Vantine v. Elkhart Brass Mfg. Co., 762 F.2d 511, 518-19 (7th Cir.1985); Moore v. Marketplace Restaurant, Inc., 754 F.2d 1336, 1359-61 (7th Cir.1985) (separate opinion, but expressing majority view on this point); In re Oil Spill by Amoco Cadiz, 699 F.2d 909, 913-14 (7th Cir.1983); Weinberger v. Kendrick, 698 F.2d 61, 76-77 (2d Cir.1982). However, in Bernstein v. Lind-Waldock & Co., supra, 738 F.2d at 187, we described the concept of pendent-party jurisdiction as "embattled," an impression strengthened by the discussion and references in 13B Wright, Miller & Cooper, Federal Practice and Procedure Sec. 3567.2 (2d ed. 1984). Bernstein noted that the concept has been rejected where the main claim is based on state law (and is therefore within federal jurisdiction only by virtue of the diversity statute), see Zahn v. International Paper Co., 414 U.S. 291, 292, 300-02, 94 S.Ct. 505, 507, 511-12, 38 L.Ed.2d 511 (1973); Sarnoff v. American Home Products Corp., 798 F.2d 1075, 1079 (7th Cir.1986), and that in Aldinger v. Howard, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), the Supreme Court had held that the concept could not be used to join a state-law claim against a municipality with a federal civil rights claim against an employee of the municipality. See also Judge Coffey's discussion of Aldinger, dissenting in the Moore case, 754 F.2d at 1353; and Charles D. Bonanno Linen Service, Inc. v. McCarthy, 708 F.2d 1, 6-11 (1st Cir.1983).
 
 
 10
 The best generalization about the current status and scope of pendent-party jurisdiction may be that no generalization is possible; the second best may be that, unsatisfactory as it is to have a sliding scale for jurisdiction, the existence of pendent-party jurisdiction depends on the pros and cons of exercising such jurisdiction in particular circumstances. However, if it appears as in Aldinger that Congress would not have wanted the federal courts to exercise jurisdiction over the pendent claim, then there is no pendent-party jurisdiction; and that may be the case here. The statute on which the district court's jurisdiction over the main claim (the bank's claim against the Secretary of Commerce) is based is narrowly drawn; as a grant of jurisdiction over suits by private parties, such as the bank, all it does is lift the bar of sovereign immunity with respect to claims arising out of the Trade Act of 1974 (in fact, with respect to just a subset of such claims). It would be odd if a jurisdictional statute of such limited and specialized purpose allowed the plaintiff fortunate enough to be able to get into district court under it to haul in a non governmental party (who could not in any event plead the defense of sovereign immunity) against which the plaintiff had a claim purely of state law, arising from an agreement collateral to the agreement with the governmental party on which the main claim was based. There is some question whether the Claims Court has, or would ever exercise, any form of pendent jurisdiction, see Strick Corp. v. United States, 625 F.2d 1001, 1010, 223 Ct.Cl. 262 (1980); ATL, Inc. v. United States, 4 Cl.Ct. 672, 676 (Cl.Ct.1984), yet that is the court this case would be in but for section 2350, and there is great doubt that Congress by enacting that statute sought to confer a more capacious jurisdiction on the district court.
 
 
 11
 So maybe there can be no pendent-party jurisdiction in suits under 19 U.S.C. Sec. 2350; but this we need not decide. Pendent jurisdiction is limited to claims that involve the same "nucleus of operative facts" as the main claim. United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). The same limitation applies to pendent-party jurisdiction, off-shoot of pendent-claim jurisdiction that it is. Zabkowicz v. West Bend Co., 789 F.2d 540, 546 (7th Cir.1986); Vantine v. Elkhart Brass Mfg. Co., supra, 762 F.2d at 518. The only relationship between the bank's claim against the Secretary of Commerce and its claim against the Hutchinsons is that the two claims have a common origin in the loan to Weber and the guaranty of that loan by the Economic Development Administration. The operative facts--the facts upon which the determination of liability in the two cases was based--are separate nuclei with much space between them. The bank's claim against the Economic Development Administration concerns the terms of the guaranty agreement and the behavior of both the bank and the EDA in administering the loan. The bank's claim against the Hutchinsons involves the terms of its agreement with the Hutchinsons. There is no overlap of legally pertinent facts or legal principles. The only argument the Hutchinsons make in their appeal is that the agreement in question could not be interpreted, as the district court thought, without taking evidence, because (they say) the agreement is inconsistent with their other agreement with the bank. These agreements have nothing more in common with the loan guaranty than a common origin in Weber's travails. That is not enough. If there is ever pendent-party jurisdiction in a case under 19 U.S.C. Sec. 2350, it is not this case, and we therefore direct the district court to dismiss the bank's claim against the Hutchinsons.
 
 
 12
 That brings us to the merits of the government's appeal. The government argues that the bank violated the terms of the loan guaranty. The argument is virtually unopposed, the bank having waived, as we shall see, its most promising counterargument. The agreement required the bank to administer the loan in the same fashion as would a "reasonable and prudent commercial bank" in dealing with a loan that had not been guaranteed by the United States Government. This provision was essential. The bank was deeply in the hole as a result of its prior loans to Weber. The government's loan guaranty offered it a way of climbing out. The temptation, against which the quoted provision was aimed, was for the bank to allow Weber to take risks with the money, since if the risks paid off, the bank would be repaid, while if the risks did not pay off, the incremental loss to the bank (10 percent of $2.1 million) would be small. Moreover, if Weber kept its head above water long enough to repay its earlier indebtedness of $1 million to the bank, the bank would be better off to the tune of $790,000 ($1 million minus $210,000), even if Weber defaulted on the later loan.
 
 
 13
 The bank yielded to temptation--notably when, only weeks before the loan closed, it failed to take any action with respect to a devastating financial statement issued by Weber's auditors for 1981. The statement showed that instead of losing a "mere" $250,000 that year--as Weber's "economic recovery plan," required by the Economic Development Administration as a condition precedent to financial assistance, showed--Weber had lost more than twice that amount. If the bank had been acting as a reasonable and prudent commercial lender, uncushioned by a federal loan guaranty, it would have reevaluated the making of the loan, in light of the collapse of Weber's relatively roseate prospects.
 
 
 14
 Later, after the loan closed, the bank engaged in other imprudent practices. It allowed Weber to purchase fixed assets without getting the bank's permission, even though such purchases, by reducing the borrower's liquidity and increasing his fixed costs, increase the danger of default. Then, after Weber defaulted, the bank continued advancing Weber money from the undisbursed portion of the $2.1 million loan, and also allowed Weber to issue overdrafts and to repay them out of its accounts receivables; these acts of forbearance diminished the assets available to pay back the loan.
 
 
 15
 Since the agreement required the bank only to exercise care and diligence in the "disbursement, servicing, collection and liquidation of the Loan," it could be argued that careless conduct in making the loan was not covered, for the making of the loan necessarily preceded disbursement, servicing, etc. The argument is supported by the fact that the quoted language appears in a section of the guaranty captioned "obligations of lender subsequent to disbursement," although there is an inconsistency between "[conduct] subsequent to disbursement" (the caption) and "disbursement" itself (the body of the section). But some of the careless acts occurred after the contract was made, as we have just noted; more important, the bank does not make the argument we have just sketched, and it is therefore waived.
 
 
 16
 The district judge agreed with the government that the bank had acted imprudently. We add: the bank's conduct amounted to a material breach (to this vital question the district court devoted only a sentence in its opinion--a sentence announcing a bare conclusion that the breach was not material), which therefore excused the government from performing its obligations under the guaranty. For, unlike the breach in Eastern Illinois Trust & Savings Bank v. Sanders, 826 F.2d 615 (7th Cir.1987), it both concerned a central undertaking of the promisor and seriously damaged the promisee, the government, which is out $2.1 million as a result of the bank's carelessness in going through with the loan in the face of mounting evidence of Weber's incapacity to repay it. The bank argues, it is true, that even if it had acted with meticulous bankerly circumspection it would have made the loan and the government would have guaranteed it. The argument is pertinent; a breach that is material is the equivalent of the trial error that is not harmless: "it is not in society's interest to permit a party to abuse this protection [of his justified expectations] by using an insignificant breach as a pretext for avoiding his contractual obligations." Farnsworth, Contracts Sec. 8.15, at p. 607 (1982). But the evidence overwhelmingly established that this undemanding standard was satisfied, and the district court's (unexplained) disagreement with this conclusion we deem clearly erroneous. If the bank had acted prudently at the outset, then upon discovering that Weber was losing money twice as fast as expected the bank would not have made the loan at all (but for the government's guarantee) and then the government's money would never have been placed at risk. The later acts of imprudence, we agree, were less important; but the cumulative picture is one of material breach, and voided the guaranty.
 
 
 17
 The district court believed that in any event the bank's imprudence was somehow cancelled by the government's. Three ideas seem merged here: that the government broke its side of the bargain; that by winking at the bank's carelessness the government in effect modified the guaranty agreement; that the government is in any event estopped by its conduct to complain of the bank's breach.
 
 
 18
 The government had received a copy of Weber's 1981 financial statement before the loan closed, and could have withdrawn from the deal, but didn't. And the employees of the Economic Development Administration who supervised the transaction with the bank became aware of many of the bank's imprudent practices yet turned a blind eye. But nothing in the guaranty agreement enjoins the guarantor to vigilance--which scotches the suggestion that the government is guilty of a breach of contract too. Nor had these subordinate officials of the Economic Development Administration who exercised inadequate oversight in this matter any actual or apparent authority to modify the terms of the guaranty. Compare United States v. Medico Industries, Inc., 784 F.2d 840, 845-46 and n. 2 (7th Cir.1986). The Trade Act of 1974 authorizes the government to make risky loans (or loan guarantees)--indeed, requires that they be risky, since a condition precedent is that the borrower be unable to obtain financing on ordinary terms in the private capital markets. But the Act also requires that there be at least a reasonable assurance of payment, and this requirement was implemented by the altogether sensible provision in the guaranty agreement requiring the bank to act with the prudence of a normal commercial bank that had made a loan not guaranteed by the federal government. The failure of the Economic Development Administration's regional staff to insist upon compliance with this provision--their attempt, perhaps, to make the Trade Act of 1974 a more charitable measure than Congress had intended--does not open the vaults of the Treasury to a bank that violated the provision.
 
 
 19
 The question whether and in what circumstances the federal government can be estopped by an act of its agents remains unsettled, but it is at least clear that "however heavy the burden might be when an estoppel is asserted against the Government, the private party surely cannot prevail without at least demonstrating that the traditional elements of an estoppel are present." Heckler v. Community Health Services, 467 U.S. 51, 61, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). (On what more might be required, see, e.g., Morgan v. Heckler, 779 F.2d 544, 545 (9th Cir.1985).) That sinks the bank's estoppel argument, for there were no promises, misrepresentations, or misleading silences, and there was no reliance by the bank. See, e.g., Azar v. United States Postal Service, 777 F.2d 1265 (7th Cir.1985); Wisconsin Winnebago Business Comm. v. Koberstein, 762 F.2d 613, 620 (7th Cir.1985); Prize Steak Products, Inc. v. Bally's Tom Foolery, Inc., 717 F.2d 367 (7th Cir.1983). The government did not come down hard on the bank's imprudent practices, but neither did it direct or encourage them.
 
 
 20
 The judgment for Citizens against the Hutchinsons is vacated with directions to dismiss the bank's complaint against them for lack of federal jurisdiction, and the judgment for Citizens against the federal defendants is reversed with directions to dismiss its claim against them on the merits. There will be no award of costs in this court.