Henrietta ARMSTRONG; Charles Heard and Kanjaddie Heard, Plaintiffs,

v.

Steven EDELSON; Chicago Lumber & Construction Company; All American Aluminum & Construction Company; Suzanne Reid; James Morrisard; Eugenie Perez; and The Dartmouth Plan, Inc., Defendants.

No. 89 C 0367.

United States District Court, N.D. Illinois, E.D.

July 19, 1989.

Daniel A. Edelman, Daniel A. Edelman, P.C., Chicago, Ill., for plaintiffs.

Richard J. Rappaport, Arthur F. Radke, and Patricia K. Smoots, Ross & Hardies, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

Plaintiffs Henrietta Armstrong, Charles Heard and Kanjaddie Heard (collectively referred to in this opinion as "plaintiffs") bring this action for damages under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.;* various state statutes; and for breach of contract. One of the defendants, The Dartmouth Plan, Inc. ("Dartmouth"), has moved to dismiss the complaint against it on the ground that the court lacks subject matter jurisdiction over the claims against Dartmouth. In the alternative, Dartmouth moves to dismiss Counts II and III and, in part, Count VI for failing to state a claim upon which relief may be granted. For the following reasons, Dartmouth's motion to dismiss is denied.

## ALLEGED BACKGROUND FACTS

Plaintiffs are consumers who assert that they have been victimized by a home repair fraud perpetrated by the defendants. According to the complaint, defendant Steven Edelson conceived of and initiated the allegedly fraudulent scheme by causing agents of two corporations within his control, defendants Chicago Lumber & Construction Company ("Chicago Lumber") and All American Aluminum & Construction Company ("All American"), to enter into "cash sales contracts" with consumers.[1] Plaintiffs assert that defendants conned the consumers into signing the contract by misrepresenting it as an estimate for repair work. The contract required the consumer to pay substantial penalties if the consumer cancelled the contract more than three days after signing it.

The complaint further alleges that, after the three-day period expired, Chicago Lumber and All American presented the customer with previously undisclosed financing terms. Agents of these construction companies coerced consumers into agreeing to the financing terms by threatening them with loss of their homes or lawsuits to recover the cancellation penalties. Once the consumer signed a financing agreement, Chicago Lumber or All American accepted payment from the customers or from financing entities. Defendants allegedly did no work or did defectively shoddy work under the contract in exchange for these payments.

The only allegation in the complaint implicating Dartmouth in this scheme concerns $16,000.00 in credit that Dartmouth extended to plaintiffs Charles and Kanjaddie Heard to finance their home improvements. On January 20, 1987 Mr. and Mrs. Heard signed a retail installment contract with Chicago Lumber that had been prepared on a pre-printed Dartmouth form. This form contained FTC language which provided that any holder is subject to the

---

1. The Illinois Attorney General allegedly has filed a number of lawsuits against Chicago Lumber and All–American for their allegedly fraudulent practices. *See People ex rel. Hartigan v. All American Aluminum & Construction Co.,* 85 CH 3845, now renumbered 88 CH 849; *Henderson v. All American Aluminum & Construction Co.,* 86 L 16604; *Nichols v. Chicago Lumber & Construction Co.,* 88 L 18424; *McCoy v. Chicago Lumber & Construction Co.,* 87 L 21361. (Amended Complaint, ¶¶ 13, 16.)

claims and defenses that Mr. and Mrs. Heard have against Chicago Lumber. *See* 16 C.F.R. part 433. The complaint alleges that Chicago Lumber failed to complete important portions of the installment contract and backdated the contract to December 1, 1986, the date of the "cash sales contract." When the Heards signed the installment contract, they simultaneously mortgaged their home to provide security for the loan. Chicago Lumber assigned this contract to Dartmouth sometime after Chicago Lumber completed its work on the Heard's home.

Plaintiffs do not allege that Dartmouth was directly responsible for Chicago Lumber's alleged fraud on the Heards. Instead, the plaintiffs allege that Dartmouth is liable because it knew that the contracts initiated by Chicago Lumber were "tainted by fraud and improper business practices." (Amended Complaint, p. 14, ¶ 55.)[2] The complaint imputes knowledge to Dartmouth on the grounds that Dartmouth itself had been the subject of both a civil complaint and a criminal investigation by the Attorney General of Connecticut and therefore was "on notice ... that it had to investigate the character and business practices of the home improvement contractors selling contracts to it." *Id.* Finally, the plaintiffs complain that Dartmouth should have known that the installment contract was backdated because it had received applications for credit from the Heards with dates subsequent to December 1, 1986.

The plaintiffs' complaint does not assert a claim under any federal law against Dartmouth. Count I of the complaint seeks treble damages from "the defendants *other*

*than Dartmouth,* jointly or severally," under Section 1962(a) of RICO. (Amended Complaint, p. 16) (emphasis added). Count II charges defendants Edelson, Chicago Lumber, All American, and their agents with violating Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act"), Ill.Ann. Stat. ch. 121½, ¶ 262 (Smith–Hurd, Supp. 1989), and charges Dartmouth with aiding and abetting these violations. Count III charges Dartmouth with violating the Illinois Sales Finance Agency Act ("Finance Agency Act"), Ill.Ann.Stat. ch. 17, ¶ 5202 *et seq.* (Smith–Hurd, 1981), by accepting the assignment of the Heard's contract. Count IV and V assert causes against defendants other than Dartmouth for breach of contract. Finally, Count VI alleges that the FTC language contained in the installment contract renders Dartmouth contractually liable for Chicago Lumber's alleged violations of RICO (Count I), the Consumer Fraud Act (Count II), and breach of contract (Count V).

## DISCUSSION

### A. *Pendent Party Jurisdiction*

Dartmouth has moved to dismiss this case on the grounds that this court lacks subject matter jurisdiction over the claims the plaintiffs assert against Dartmouth. Dartmouth notes that the plaintiffs' complaint asserts only state law causes of action against Dartmouth, and contends that this court therefore has subject matter jurisdiction over Dartmouth only through the doctrine of pendent party jurisdiction. Dartmouth argues vigorously that the allegations of the plaintiffs' complaint are not

**2.** Dartmouth has moved to strike paragraphs 12, 16, 55, and 57 of the amended complaint under Fed.R.Civ.P. 12(f) on the grounds that they are "scandalous." Rule 12(f) permits a court to strike from a complaint any "redundant, immaterial, impertinent, or scandalous matter." The paragraphs that Dartmouth requests the court to strike concern lawsuits against Dartmouth that have been brought by consumers other than plaintiffs.

The court need not strike these paragraphs from the amended complaint. The plaintiffs did not include the allegations in these paragraphs for any improper purpose. Paragraph

12 does not apply to Dartmouth. Paragraph 16 alleges that the defendants' fraudulent scheme was "massive" and sets forth four lawsuits against All American and Chicago Lumber as support. Paragraph 55 concerns lawsuits against Dartmouth, and is included as factual support for the plaintiffs' proposition that Dartmouth knew of the underlying fraudulent scheme. Finally, Paragraph 57 supports the plaintiffs' allegations that the statute of limitations has been tolled. Although harmful to Dartmouth's defense, the allegations in these paragraphs are not immaterial to this complaint.

sufficient to invoke the pendent party jurisdiction of this court.

■ "Pendent party jurisdiction arises when a plaintiff brings a federal claim in federal court against one party, and brings a related state-law claim against *another* party." [3] *Huffman v. Hains*, 865 F.2d 920 (7th Cir.1989). In *Huffman*, the Seventh Circuit described the factors which bear on a court's decision to exercise its pendent party jurisdiction:

> Our cases have set forth a two-step analysis to determine whether pendent party jurisdiction exists in a particular case. First, the court must examine whether the constitutional power to exercise such jurisdiction exists. Second, the court must examine whether Congress has limited the court's power to exercise pendent party jurisdiction in the specific statutory provision conferring federal jurisdiction in that case. The constitutional power to exercise pendent party jurisdiction exists if the federal claim is not frivolous, the federal and state claims " 'derive from a common nucleus of operative fact,' " and the federal and state claims are the kind that the plaintiff " 'would ordinarily be expected to try ... in one judicial proceeding.' " The statutory power to exercise pendent party jurisdiction depends upon whether "Congress in the [particular statutory grant at issue] has ... expressly or by implication negated" pendent party jurisdiction.

*Huffman*, 865 F.2d at 922–23 (citations omitted). *See also Citizens Marine National Bank v. United States Department of Commerce*, 854 F.2d 223, 226–27 (7th Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 1312, 103 L.Ed.2d 582 (1989); *Zabkowicz v. West Bend Co.*, 789 F.2d 540, 547 (7th Cir.1986); *Vantine v. Elkhart Brass*

*Mfg. Co., Inc.*, 762 F.2d 511, 519 (7th Cir. 1985); *Bernstein v. Lind–Waldock & Co.*, 738 F.2d 179, 187–88 (7th Cir.1984). The decision of whether to exercise pendent party jurisdiction is a matter of the court's discretion, and not a matter of right. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

■ After reviewing the allegations of the complaint in light of this standard, the court determines that it has the constitutional power to exercise pendent jurisdiction over Dartmouth. It is clear that the plaintiffs' RICO claim is not frivolous, especially in light of the defendants' experience with similar complaints of fraud.[4] It is also clear that the plaintiffs' allegations against Dartmouth might logically be tried together with the claims against the other defendants. The essence of the plaintiffs' case against Dartmouth is that it accepted the assignment of installment contracts which the other defendants had procured through fraudulent means. A plaintiff logically might bring a claim against the assignee of the contracts in the same lawsuit as a claim against the original holder of the contracts.

Finally, the plaintiffs' allegations concerning Dartmouth are factually linked to the allegations against the other defendants. Dartmouth insists that the complaint's allegations of RICO fraud encompass only the methods by which Mr. Edelson and his agents procured the home improvement contracts, and contend that Dartmouth was involved in the scheme only as an assignee of the ultimate installment contract. However, the complaint alleges that Dartmouth was a knowing participant in the improper business practices of Chicago Lumber. According to the complaint,

---

**3.** As an initial matter, the court may have jurisdiction over the plaintiffs' claims against Dartmouth on the basis of diversity of citizenship. All the plaintiffs are "residents" of Illinois. (Amended Complaint, ¶¶ 3, 4). Dartmouth is a corporation of unknown citizenship with its principal place of business in Garden City, New York. (Amended Complaint, ¶ 11). It is possible from these allegations that the citizenship of the plaintiffs and that of Dartmouth are completely diverse. However, the allegations of the complaint are not sufficient to make this determination.

**4.** This court expresses no opinion whatsoever as to the validity of the plaintiffs' RICO claim. The court merely assumes for the purposes of this motion that Count I of plaintiffs' complaint states a valid claim under RICO.

the installment contract which Chicago Lumber presented to the Heards was written on a pre-printed Dartmouth form. (Amended Complaint, ¶ 46.) Plaintiffs allege that Dartmouth knowingly permitted Chicago Lumber to backdate the Heard's contract. (Amended Complaint, ¶ 56.) Plaintiffs also allege that Dartmouth had a previous history of involvement with allegedly fraudulent home improvement scams. (Amended Complaint, ¶ 55.) Plaintiffs' claims that Dartmouth violated various state consumer protection statutes therefore are integrally connected to the plaintiffs' claims against Mr. Edelson and his companies.

█ The second factor this court must consider in deciding whether to exercise pendent party jurisdiction over Dartmouth is whether Congress has limited or negated pendent jurisdiction in the RICO statute. Resolution of this step in the analysis "calls for careful attention to the relevant statutory language." *Finley v. United States*, — U.S. —, —, 109 S.Ct. 2003, 2007, 104 L.Ed.2d 593 (1989), quoting *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), where the Court held that district courts cannot entertain claims against pendent parties when the federal statute which confers jurisdiction excludes those parties from its coverage.[5] Citing *Fleet Credit Corp. v. Sion*, 699 F.Supp. 368 (D.R.I.1988), Dartmouth contends that federal courts should decline to exercise pendent party jurisdiction in order to curtail abuses of the RICO statute:

> [T]he purpose of RICO is to protect legitimate businesses from organized crime, not to provide a federal cause of action

for state law contract claims. Due to the overbreadth of the statute as written and in contravention of legislative intent, the federal courts may now be faced with a flood of civil RICO actions stemming from ordinary contract fraud disputes. However, this is no reason to allow non-RICO state law claims against parties not before the Court to wash in on the incoming tide.

699 F.Supp. at 381 (*dicta*).

Although this court is acutely aware that plaintiffs often stretch ordinary claims of fraud into federal claims under the RICO statute, this awareness does not dictate the result that Dartmouth seeks. Nothing in the language of RICO indicates that Congress intended to preclude a plaintiff from bringing an action under a state consumer fraud statute as a pendent claim to a RICO claim. Section 1964(c) states simply that:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c). *See Nicolazzi v. Colombik*, 670 F.Supp. 823, 826 (N.D.Ill.1987) (concluding that RICO did not preclude pendent state law claims for breach of fiduciary duty or negligence). This is not a case, therefore, in which the exercise of pendent party jurisdiction would circumvent an exclusion from liability which is contained within the federal statute.

The allegations of the complaint support this court's exercise of pendent party juris-

---

5. In *Aldinger*, plaintiff brought a civil rights action under Section 1983 against various officials of Spokane County, Washington and sought to include as a pendent claim a state law action against the county. (In *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the Court ruled that counties were not amenable to Section 1983 actions. After the Court decided *Aldinger*, the Court, overruling *Monroe*, held that counties are subject to liability under Section 1983. *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).) The *Aldinger* Court upheld the district court's decision *not* to exercise its

pendent jurisdiction on the grounds that courts cannot use pendent party jurisdiction to bring parties back into lawsuits from which Congress has excluded them.

In *Finley*, the Court held that a district court could not exercise pendent party jurisdiction over claims for negligence in a suit under the Federal Tort Claims Act ("FICA"), 28 U.S.C. § 1346(b). The Court reasoned that language in the FTCA which authorized suits "against the United States" means against the United States and no one else. *Finley*, — U.S. at —, 109 S.Ct. at 2008–09.

diction over Dartmouth. The plaintiffs' claims against Dartmouth arise from the same basic facts as their claims against the other defendants. All of the claims in the complaint should be brought together in one lawsuit to ensure a complete disposition of the claims. Moreover, the RICO statute does not indicate that Congress has expressly or implicitly negated pendent party jurisdiction over state consumer fraud claims. Accordingly, Dartmouth's motion to dismiss on the grounds that this court lacks subject matter jurisdiction over the plaintiffs' claims against Dartmouth is denied.

## B. *Failure to State a Claim*

The standard for dismissal under Rule 12(b)(6) is well-established. In deciding whether to dismiss a complaint under Rule 12(b)(6), the court must accept the allegations of the complaint as true and must view them in the light most favorable to the plaintiff. *Hishon v. King & Spaulding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). A complaint should be dismissed for failure to state a claim only if appears beyond doubt that the plaintiff is unable to prove any set of facts that would entitle the plaintiff to relief. *Doe v. St. Joseph's Hospital,* 788 F.2d 411, 414 (7th Cir.1986).

### 1. Count II

■ Count II of the plaintiffs' complaint alleges that Dartmouth aided and abetted the other defendants' violations of Section 2 of the Consumer Fraud Act, Ill.Ann.Stat. ch. 121½, ¶ 262 (Smith–Hurd, Supp.1989).[6] Dartmouth contends that the complaint fails to state a claim against Dartmouth because under Section 10a of the Act a consumer has a cause of action only against those persons who personally violate its provision. Ill.Ann.Stat. ch. 121½ ¶ 270a (Smith–Hurd, Supp.1989).

---

**6.** Section 2 provides:
Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact,

This court's research has failed to disclose a case in which a court imposed liability under the Consumer Fraud Act for aiding and abetting a violation of Section 2. However, this court believes that the plaintiffs have nonetheless stated a claim against Dartmouth under the Act. At common law, one who knowingly accepts the benefits of fraudulent conduct is also guilty of the fraud. *Heastie v. Community Bank of Greater Peoria,* 690 F.Supp. 716, 722 (N.D.Ill.1988), citing *Shacket v. Philko Aviation, Inc.,* 590 F.Supp. 664, 668 (N.D.Ill.1984) (summarizing Illinois law). Plaintiffs' allegation that Dartmouth knowingly participated in the fraud perpetrated by the other defendants, if taken as true as it must be, is sufficient to support a cause of action under the Consumer Fraud Act.

Concluding that plaintiffs have stated a cause of action against Dartmouth under the Consumer Fraud Act is consistent with the purposes of the Act. Section 11a of the Act provides that the Act "shall be liberally construed to affect the purposes thereof." Ill.Ann.Stat. ch. 121½, ¶ 271a (Smith–Hurd, Supp.1989). This conclusion is also bolstered by decisions of the Illinois courts:

> As this court has previously ruled, 'we perceive a clear mandate from the Illinois legislature that the courts of this State are to utilize the Consumer Fraud Act to the utmost degree in eradicating all forms of deceptive and unfair business practices and to grant appropriate remedies to defrauded consumers.'

*Warren v. Le May,* 142 Ill.App.3d 550, 563, 96 Ill.Dec. 418, 425, 491 N.E.2d 464, 471 (5th Dist.1986), quoting *American Buyers Club v. Honecker,* 46 Ill.App.3d 252, 257, 5 Ill.Dec. 666, 670, 361 N.E.2d 1370, 1374 (5th Dist.1977). Dartmouth's motion to dismiss Count II of the complaint is denied.

### 2. Count III

■ In Count III of the complaint, plaintiffs purport to state a cause of action

---

with intent that others rely upon the concealment, suppression, or omission of such material fact, ... are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.
Ill.Ann.Stat. ch. 121¼, ¶ 262 (Smith–Hurd Supp. 1989).

against Dartmouth under Section 16 of the Finance Agency Act. Ill.Ann.Stat. ch. 17, ¶ 5234 (Smith–Hurd, Supp.1989). Section 16 permits an individual who sustains a loss as a result of a violation of the Act to recover compensation and a civil penalty not to exceed 25% of the retail installment contract in a civil action for damages.[7] The plaintiffs allege that Dartmouth violated the act by accepting the assignment of the Heard's contract despite the fact that the undated contract failed to describe the goods or services which were the subject of the contract.[8]

In its motion to dismiss, Dartmouth does not dispute the plaintiffs' assertion that Dartmouth's actions in connection with the Heard contract violated the Finance Agency Act. Rather, Dartmouth asserts that the Heards cannot state a claim under the Act because they were not damaged "as a result of" Dartmouth's alleged violations.

The allegations in Count III of the plaintiffs' complaint are sufficient to support a cause of action under the Finance Agency Act. In Paragraph 78 of the complaint, the plaintiffs allege that Dartmouth's violations of the Finance Agency Act caused harm to the Heards because they could not cancel the contract and because the contract obligated them to pay for work they did not receive. Clearly, backdating a contract and presenting it beyond the contractual three-day cancellation period tends to deprive the consumer of his right to cancel within three days. Moreover, this court can reasonable infer that the defective and incomplete home repairs Chicago Lumber provided to the Heards might have resulted at least in part from the uncertainty in the contract as to what performance Chicago Lumber was expected to provide. Dartmouth's motion to dismiss Count III of the complaint therefore is denied.

### 3. Count VI

In Count VI, Mr. and Mrs. Heard seek to draw Dartmouth into the claims against Chicago Lumber by invoking certain language in their contract which is mandated by a Federal Trade Commission ("FTC") regulation. This FTC regulation states that it constitutes an unfair or deceptive practice to accept a consumer credit contract which does not contain the following provision:

### NOTICE

Any holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto or with the proceeds hereof. Recovery hereunder by the debtor shall not exceed amounts paid by the debtor hereunder.

16 C.F.R. § 433.2 (the "FTC rule").

Dartmouth asserts that, despite its broad language, the FTC rule does not operate to subject Dartmouth to liability for plaintiffs' fraud claims against Chicago Lumber. Rather, defendants assert, Congress intended this rule to apply only to those limited claims or defenses which "constitute legally sufficient claims and defenses in a sales transaction." (Defendants' Memo at 18). Plaintiffs, on the other hand, contend that Congress expressly intended to include "fraud" among the claims which

---

7. Section 16 of the Finance Agency Act states:

An individual who sustains loss as a result of a sales finance agency's violation of this Act, may, in a civil action against the sales finance agency, recover damages, or may, in an action brought by the sales agency to collect an indebtedness arising out of a retail sales transaction, raise such damages by way of a counterclaim or offset. In either such action, the court may allow as an additional part of the recovery, offset or counterclaim, penal damages in an amount not more than 25% of the principal amount of the retail contract, retail charge agreement, or evidence of indebtedness which is the subject of the action. In addition, the court may allow that aggrieved individual his reasonable attorney's fees.

Ill.Ann.Stat. ch. 17, ¶ 5234 (Smith–Hurd, Supp. 1989).

8. These actions allegedly violated Sections 3 and 4 of the Illinois Retail Installment Sales Act. Ill.Ann.Stat. ch. 121½, ¶ 503–04 (Smith–Hurd, Supp.1989). Section 8.5 of the Finance Agency Act makes it unlawful for an entity to knowingly violate any provision of the Retail Installment Sales Act, Ill.Ann.Stat. ch. 17, ¶ 5213 (Smith–Hurd, 1981).

a consumer may assert against the assignees of his retail sales contract.

Nothing in either the FTC rule itself or in the commentary surrounding the rule requires the court to limit the effect of the rule to contractual claims and defenses. The FTC commentary which accompanied the publication of the rule on its effective date states that the purpose of the rule is "to preserve the consumer's legally sufficient claims and defenses so that they may be asserted to defeat or diminish the right of a creditor to be paid, where a seller who arranges financing for a buyer fails to keep his side of the bargain." Guidelines on Trade Regulation Rule Concerning Preservation of Consumers' Claims or Defenses, 41 Fed.Reg. 20,023–024 (1976). The FTC expressly included "fraud" in the list of claims preserved by the rule:

> In the course of public proceedings of the Rule the Commission documented numerous cases where consumer purchase transactions were financed in such a way that the consumer was legally obligated to make full payment to a creditor despite breach of warranty, misrepresentation, and even fraud on the part of the seller.

*Id.* The commentary further provides that "[t]he rule does apply to all claims or defenses connected with the transaction, whether in tort or contract." *Id.* at 20,024.

Earlier statements of the rule's purpose contained similar language. *See* Promulgation of Trade Regulation Rule and Statement of Basis and Purpose, 40 Fed.Reg. 53,506 *et seq.* (1975). Moreover, the FTC explicitly contemplated fraud and dishonesty in the home improvement industry when it drafted the rule. The FTC noted:

> Home improvements have long been an area subject to considerable deception and outright fraud. In one especially outrageous scheme, which cost hundreds of homeowners millions of dollars, a few homeowners suits are finally being heard in the courts. Because the contractor has become bankrupt, however, and because consumers cannot maintain claims or defenses against holders in due course of their negotiable instruments, consum-

ers who are fortunate enough to obtain favorable judgments in court will receive only about five cents on the dollar when the remaining meager assets of the contractor are distributed to satisfy debts and judgments.

*Id.* at 53,511.

The FTC clearly contemplated sales contracts such as the one the Heards entered into with Chicago Lumber when it adopted the rule. Moreover, the FTC did not limit the scope of the rule to contract defenses. Consequently, Dartmouth's motion to dismiss Count VI of the complaint is denied.

### CONCLUSION

For the reasons stated in this memorandum opinion, Dartmouth's motion to dismiss is DENIED. The parties are urged to discuss settlement of this case and to report on the status of settlement negotiations on August 21, 1989 at 10:00 a.m.