Robert A. **CONSTANT**, Plaintiff,

v.

**CONTINENTAL TELEPHONE COMPANY OF ILLINOIS, and Ed Bennett, Defendants.**

No. 89–4058.

United States District Court, C.D. Illinois, Rock Island Division.

Aug. 29, 1990.

---

Gregory McHugh, Aledo, Ill., for plaintiff.

Robert E. Arroyo, Chicago, Ill., for defendants.

## ORDER

MIHM, District Judge.

Before the Court is a Motion by the Defendants for summary judgment (# 32) which is brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Court grants the Defendants' Motion for Summary Judgment (# 32).

## BACKGROUND

Constant grew up in Aledo, Illinois, and attended Western Illinois University in Macomb, Illinois. Constant was employed by

Contel as an engineer from 1972 until his employment ended in June, 1987. Constant was born on December 16, 1945, and, at the time of his termination, he was 41 years of age.

Constant received many awards during his service at Contel and the Defendants admit this. Also, Constant was a kidney transplant recipient who was on special medicine. The parties dispute whether the Plaintiff's medical condition had anything to do with Plaintiff's separation from Contel.

Constant commenced working for Contel in its Aledo, Illinois office. Constant and his wife have resided in the Aledo area for most of their lives. In 1985, Contel transferred Constant to its Carthage, Illinois office, which is approximately 70 miles from Aledo. Rather than relocate his residence to Carthage, Constant rented an apartment in Carthage and commuted on weekends to his home in Aledo. Constant held the position of outside plant engineer.

Bennett, a supervising engineer, was Constant's immediate supervisor. Bennett works at Contel's Mascoutah, Illinois office. Mascoutah is approximately 280 miles from Aledo.

On Friday, June 26, 1987, Constant and Bennett met at the Carthage office where Bennett presented Constant with a 15 year anniversary tie tack. The two traveled to Macomb, Illinois for lunch and discussed upcoming work assignments. During lunch, Bennett informed Constant that Constant was being transferred to Mascoutah, Illinois. The Defendants assert that Constant felt it was unfair to be transferred twice within two years. Bennett claims that while returning to Carthage after lunch, Constant became increasingly angry about the transfer to Mascoutah and punched Bennett in the face. Constant denies that he hit Bennett. (Constant deposition at 88–89, 96–97; Constant deposition Exhibit 1 at 3; Bennett deposition at 84–91, 98).

The Plaintiff asserts that upon return to work, Ed Bennett went to the washroom while Plaintiff talked with his immediate supervisor, Paul Ellis. The Plaintiff maintains that Bennett entered the room and accused Plaintiff of punching Bennett in the face. (Constant deposition at 106–113). In an interoffice memo dated June 30, 1987, Paul Ellis confirmed Constant's story regarding what Constant claimed happened at the office. (Defendants' production document # 227).

There is no indication in Ellis' memo that Constant called Bennett a liar or that Constant threatened Bennett. Bennett claims that Constant called Bennett a liar and threatened Bennett in front of Paul Ellis. (Defendants' production document # 223). Paul Ellis stated in his memo that Bennett left the office after he told Constant that he hit him. There is no indication in Ellis' memo that Constant called Bennett a liar or that Constant threatened Bennett.

Constant maintains that he finished working that day but that he could not sleep. He testified that the next Saturday he talked to an old supervisor to voice the fear of losing his job. (Constant deposition at 122–123). The Plaintiff then decided to go for a check up at the Mayo Clinic. The Plaintiff left the clinic on Wednesday, July 1. On July 2, he claims that he was at his home recuperating. While at the Mayo Clinic, a supervisor told the Plaintiff to be in Springfield on Friday, July 3. (Constant deposition at 129–130).

Representatives of Contel met with Constant and Bennett in Springfield, Illinois, on Friday, July 3, 1987 to discuss Bennett's contention that Constant hit Bennett and to determine whether Constant was agreeable to transferring to Mascoutah. When Constant arrived in Springfield, Constant was required to talk with a Mr. Mahoney (Contel's security administrator) for about one hour about the alleged hitting of Bennett. (Bailey deposition at 14). Constant testified that it appeared that Mahoney believed Bennett's story. (Constant deposition at 136). Constant testified that Mahoney dragged him to the window for a physical exam of the Plaintiff's hands. *Id.* Mahoney advised the Plaintiff to apologize or to lose 15 years of his life at his job. (*Id.* at 137). Constant stated that he was not go-

ing to apologize for something he did not do. (*Id.*).

The Plaintiff then met with Robert Fox, Elaine Bailey, and Mahoney. Bennett was also present. At this meeting, Constant stated that he probably would not agree to transfer. (Constant deposition at 130–134, 150–151). Plaintiff indicated that it was his impression at the time of the meeting that because he would not apologize to Bennett, he was out of a job. Constant felt that it would be difficult for him to transfer and continue to work under Bennett's supervision. (*Id.* at 50).

As a result of this conversation, the Contel representatives presented Constant with a resignation agreement entitled "Termination Agreement" and requested that Constant consider signing it and delivering it to Contel's Sycamore, Illinois, office on or before Tuesday, July 7, 1987. At the meeting, Constant claimed that the word "termination" in the agreement was too strong, so the Contel representatives changed the word to "separation." The word "separation" sounded better to Constant. (*Id.* at 143–147 and attached Exhibit 4).

Constant was told that if he did not sign the separation agreement, Contel would proceed with the investigation of whether he struck Bennett. Constant asserts that, although he was not directly told he would be fired, he believed that the Contel representatives were pre-disposed to believe that he struck Bennett and that if he did not sign the agreement he would be fired and not receive the severance payment provided for in the agreement. (*Id.* at 144–146).

Bailey testified that she could recall that only the release form was brought to the meeting by the Contel group. (Bailey deposition at 21). Constant now argues that because no other form was brought to the meeting, Contel had not considered less drastic measures which would allow the Plaintiff to keep his job.

Regarding the severance pay standard, Contel asserts that there are no rules or regulations at Contel requiring that any sum be given to employees who resign. However, Contel admits that the amount of severance pay granted to Constant was based upon separation pay guidelines established by itself. Contel asserts that using the guidelines and providing separation pay are wholly discretionary and are determined by Contel on a case-by-case basis. (Bailey deposition at 22, 24–27, 35–37, 73). Contel contends that the severance pay given to Constant was paid in consideration of his resignation and release. (Defendants' answer to interrogatory # 1).

Contel maintains that the discretionary nature of the separation pay guidelines is exemplified by two separation agreements Contel entered into with other employees. In October 1989, Contel negotiated separation payments with employees John Boswell and William Fuller. Contel chose to offer Boswell separation pay after he announced his plan to terminate his employment with the company. However, it asserts that the amount offered was not based upon the discretionary guidelines applied in Constant's case. (Bailey deposition at 34–37 and attached Exhibit 9). Also, Contel contends that the amount of separation pay offered Fuller was determined by the Human Resources Department without recourse to the separation pay guidelines. (Bailey deposition at 37–38 and attached Exhibit 8).

Contel's separation guidelines state in the section entitled "Principal":

> Contel of Illinois believes that it is in the company's and employee's best interest to provide assistance if an employee is separated *due to work force restructuring, reorganization, job elimination, or failure to meet performance standards, through the use of separation pay.* (Emphasis added).

The "policy" section of the separation guidelines provides:

> Employees will not be eligible for separation pay if separated due to: retirement; disability; *resignation; termination for cause.* (Emphasis added).

Applying the policy guidelines, Boswell was probably not given the amount of severance pay provided for in the policy be-

cause he resigned to take another job. (See Bailey deposition Exhibit 9).

In Bailey's deposition, she admitted that Fuller was terminated because of his job performance. Under the part of the separation guidelines entitled "principal," Contel must pay employees who failed to meet the performance standards separation pay (assuming the separation guidelines are obligatory). Under the "policy" section of the separation guidelines, Contel is not obligated to pay employees benefits when they are "terminated for cause." Thus, because the separation guidelines apparently conflict on whether Fuller would be entitled to separation pay under the guidelines, the implications of Contel's failure to pay Fuller separation pay is unclear and does not resolve the question whether the separation pay guidelines are obligatory or are merely discretionary.

In this case, if the allegations of Bennett were true, then Constant could have been terminated for cause and not given any benefits. In any event, apart from the possibility that Constant could have been terminated for cause, Constant resigned; therefore, according to its policy, Contel was not obligated to provide severance pay under its separation guidelines. Because Contel paid Constant separation benefits (it does not appear that they were obligated in any way to pay him under these guidelines), there was consideration paid for the release of claims against Contel. Further, because Contel was not obligated to pay Constant anything under the plain terms of the separation pay guidelines, the Court does not have to resolve the question of whether or not the guidelines were obligatory or discretionary.

The Plaintiff asserts that he was told that if he did not sign the release he would not receive any money, and he would face a continuing investigation over the alleged hitting of his supervisor while having to be supervised by the alleged victim, Bennett. (Constant deposition at 143–144). Constant felt he was going to be terminated either way and that if he signed he would have money and that if he did not he would not have any money. (*Id.* at 72, 144, 150).

On Monday, July 6, 1987, Constant met several times with an attorney, Albert Ancelet, in Carthage to review the situation. (Ancelet deposition at 1–12, 24). Ancelet was only available because Constant saw him at a barbecue on July 3. (Ancelet deposition at 6, 24). It appears Ancelet billed Constant for three hours of time that day. (*Id.* at 16). Ancelet's testimony indicates that the discussion centered on the investigator's allegation that Constant hit a supervisor and the signing of the release. (*Id.* at 10).

Ancelet telephoned Contel and requested an extension of time from July 7, 1987 to July 9, 1987, for Constant to decide whether to sign the separation agreement. Contel declined to grant an extension but agreed that Constant could deliver the agreement by the end of the business day on July 7, 1987, to Contel's office in Carthage rather than in Sycamore. Bailey testified that Robert Fox had indicated that since the release document was short and uncomplicated an extension was inappropriate. (Bailey deposition at 32).

Ancelet then testified that he told Constant that Ancelet was pressed for time to give Constant a full legal opinion on whether to sign the agreement. Contel asserts that Ancelet recommended that Constant sign the agreement. Ancelet denies he made any recommendation to Constant because he did not have any employee handbooks available. (Ancelet deposition at 15). Constant testified that he may have shown Ancelet an employee handbook. (Constant deposition at 155). Constant also stated that Ancelet recommended that he sign the release after he explained to him that he was out of a job and that he would need money to live on. (*Id.* at 159). In addition, Constant stated that Ancelet said that he was pressed for time to give a full legal opinion. (*Id.*).

Constant then signed the agreement and Ancelet co-signed it as a witness. Constant delivered the agreement to Contel in Carthage on the afternoon of July 6, one day early.

A few weeks after signing the release, Constant received a check from Contel for

$22,092, less withholding taxes. Constant deposited the money in his money market account and spent it during the course of the next six to nine months. Constant has never offered to return the money to Contel, and, prior to December of 1987, he did not complain to Contel about the separation agreement he signed. (Constant deposition at 169–171).

The Plaintiff was out of work because of his separation from Contel from July of 1987 until February of 1988. (Constant deposition at 183). He began working in February of 1988 for Muscatine Power and Water in Muscatine, Iowa, which is approximately 34 miles from Aledo. (*Id.* at 181–183). He is still currently employed as an engineer for Muscatine Power and Water. (*Id.*).

In June 1989, Constant filed this lawsuit alleging that Contel terminated his employment on the basis of his age and that Bennett interfered with his contractual relationship with Contel.

It is undisputed that Contel hired a young college graduate, Mike Davis, at a $20,000 cost savings to replace Constant. (Defendants' answers to interrogatories at ¶¶ 15, 19).

## DISCUSSION

The Plaintiff Constant filed this suit against Contel and Bennett, the Plaintiff's supervisor, alleging that Contel terminated Plaintiff's employment on account of his age and that Bennett interfered with Plaintiff's contractual relations with Contel.

The Defendants are moving for summary judgment on the grounds that Plaintiff, by signing the release, waived the right to bring this lawsuit. The Plaintiff admits signing the release; however, the Plaintiff asserts that there are genuine issues of fact in dispute which preclude summary judgment. The Plaintiff contends that the release prepared in advance by the Defendants refers only to voluntary termination and omits any reference to the Age Discrimination in Employment Act. Further, the Plaintiff asserts that he was under medical, economic, and personal duress due to the possibility of losing vital medical coverage, all his income, and his freedom due to an alleged criminal charge. In addition, he maintains that the rushed consultation with a local attorney did not allow any thought or reasoned decision in the case. Finally, the Plaintiff asserts that there could be no consideration in this case as Constant was going to receive severance pay anyway.

### A. General Rules Governing Releases

■ The United States Supreme Court has held that a plaintiff may waive his cause of action under Title VII by knowingly and voluntarily executing a release of claims. *Alexander v. Gardner–Denver Company*, 415 U.S. 36, 52, 94 S.Ct. 1011, 1021, 39 L.Ed.2d 147 (1974). However, an employee's rights under Title VII may not be waived prospectively. *Id.* The same analysis applies to releases executed in cases involving the Age Discrimination in Employment Act (ADEA). *Riley v. American Family Mutual Insurance Company*, 881 F.2d 368, 371 (7th Cir.1989); *Bormann v. AT & T Communications Inc.*, 875 F.2d 399, 402 (2nd Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 292, 107 L.Ed.2d 272 (1989).

■ In addition, public policy favors a voluntary settlement of employment discrimination claims. *Stroman v. West Coast Grocery Company*, 884 F.2d 458, 460–461 (9th Cir.1989). One court has stated:

> We do not believe that a settlement of a fact dispute in this fashion compromises the policies of the ADEA, in the absence of fraud, deceit, or unconscionable overreaching, and is in accordance with encouraging amicable arms-length settlement of private disputes.

*Moore v. McGraw Edison Company*, 804 F.2d 1026, 1033 (8th Cir.1986).

Thus, under the standard established by the Supreme Court in *Alexander*, a release is effective if the employee's consent to the settlement was voluntary and knowing. *Alexander*, 415 U.S. at 52, n. 15, 94 S.Ct. at 1021, n. 15. However, the Court must first determine whether the release was unambiguous. *See, Riley*, 881 F.2d at 373.

### B. Was the Language of the Release Signed by the Plaintiff Clear and Unambiguous?

▮ The relevant language of the release provided that the Plaintiff released Contel from:

> ... all claims, actions, causes of action, and liabilities of whatsoever kind or nature, including but not limited to claims of discrimination....

(See Separation Agreement, ¶ 1).

The Plaintiff asserts that a release is considered unambiguous if the Plaintiff employee negotiated it, the release cites a particular federal statute under which the claim is being released, and duress is absent. *Pilon v. University of Minnesota*, 710 F.2d 466 (8th Cir.1983). Further, the Plaintiff maintains that "a release of rights under the Age Discrimination Act is suspect where it is not part of the settlement of an age discrimination claim." *Mashman v. Universal Match Corp.*, 727 F.Supp. 941, 944 (E.D.Pa.1989).

The Plaintiff is incorrect in stating that duress must be absent for a release to be considered unambiguous. Duress has nothing to do with the ambiguity or lack of ambiguity in the release. Duress relates only to the issue of to whether or not the Plaintiff voluntarily signed the release. *See, Pilon*, 710 F.2d at 468. Further, there is no language in the *Pilon* case which suggests that the release must cite the particular federal statute to be considered unambiguous. And, the fact that a plaintiff negotiated a release has to do with the voluntariness of the employee's consent and not with the ambiguity or lack of ambiguity of the release. *Id.* at 468.

The *Mashman* case is also distinguishable because in that case the court made the statement that a release of rights under the ADEA is suspect if it is not part of a settlement of an age discrimination claim just before it also noted that the court must determine whether the waiver of the age discrimination claim was knowing and willfully made. *Mashman*, 727 F.Supp. at 944. Under *Mashman*, a release's voluntariness, not its clarity, is suspect if it is not part of the settlement of an age discrimination claim.

Further, the court in *Runyan v. National Cash Register Corp.*, 787 F.2d 1039, 1044 n. 10 (6th Cir.), *cert. denied*, 479 U.S. 850, 107 S.Ct. 178, 93 L.Ed.2d 114 (1986) stated that it rejected the plaintiff's argument that the waiver did not apply to ADEA claims because it did not specifically refer to the ADEA. *See also, Lancaster v. Buerkle Buick Honda Company*, 809 F.2d 539, 540–541 (8th Cir.), *cert. denied*, 482 U.S. 928, 107 S.Ct. 3212, 96 L.Ed.2d 699 (1987). Because the release refers to "all" claims rather than a specific claim does not make a release ambiguous.

This Court believes that the language of the release in this case is unambiguous. The court in *Lohman v. Morris*, 146 Ill. App.3d 457, 100 Ill.Dec. 263, 266, 497 N.E.2d 143, 146 (3rd Dist.1986), found that language which stated that the parties were released from "... any and all claims and liability ..." was unambiguous. Other cases have held that comparable language was clear and unambiguous where the release recited that all claims known and unknown were barred. *See, Pilon*, 710 F.2d at 467–468; *Sherman*, 709 F.Supp. at 1438; *Stroman*, 884 F.2d at 460–461.

### C. Was the Plaintiff's Waiver Knowing and Voluntary?

▮ The Defendants contend that the Plaintiff, in his Second Amended Complaint, fails to reference the fact that he signed a separation agreement. They assert that he makes no allegations concerning the circumstances under which the release was executed. The Defendants maintain that failing to raise the issue is grounds for dismissal, and, on the basis of this omission alone, the Court must conclude that the waiver was knowing and voluntary. The court stated in *Sherman v. Standard Rate Data Service, Inc.*, 709 F.Supp. 1433, 1439 (N.D.Ill.1989):

> If the plaintiff fails to allege that the defendant misrepresented the terms of the release or that she was unaware of the terms of the same, then the court must conclude that the plaintiff's assent

to the release was voluntary and knowing. (Citation omitted). Sherman makes no allegation concerning the integrity of the release or her lack of knowledge as to its terms. Thus, the court must conclude that she voluntarily and knowingly waived her right to assert a Title VII claim based upon acts allegedly committed by Standard Rate prior to the date of the release.

The Defendants assert that, like the *Sherman* plaintiff, Constant has made no allegations in any of his three Complaints that he was unaware of the terms of the agreement. Thus, the Defendants claim that, because Constant alleges neither that the terms of the release were misrepresented to him nor that he was unaware of its terms, he waived his right to state a claim against Contel.

The Plaintiff contends that his failure to plead in his Complaint that the release was invalid is irrelevant. In other words, he asserts that the failure to plead facts invalidating the release *is not an admission.* In addition, the Plaintiff asserts that, because there is a summary judgment motion before the Court and evidence before the Court sufficient to sustain allegations of duress and lack of knowledge, the Motion should not be granted.

This Court agrees with the Plaintiff. Because the Plaintiff did not plead the release at all, his failure to plead facts vitiating the release does not constitute an admission. And, because there is now evidence before the Court regarding the invalidity of the release, this Court believes that it is required to consider that evidence. However, the Court believes that the Plaintiff would be required to file an Amended Complaint alleging the execution of release and the circumstances which invalidate the release to conform to the proof if this Court were not to granting summary judgment for the Defendant based on other reasons.

The Plaintiff concedes that a document was signed; however, he contends that a finding of knowing and voluntary signature of that document cannot be made without the Court first judging the credibility of witnesses. *Glass v. Rock Island Refining Corp.*, 788 F.2d 450, 455 (7th Cir.1986).

In *Glass*, the court did state that whether a plaintiff knowingly and voluntarily agreed to settle his claim is a question of fact. *Id.* at 455. However, in making this statement, the Seventh Circuit was simply affirming the fact that there was a disputed question of material fact in that particular case, and, therefore, the Court would have to review the question of fact under the clearly erroneous standard. *Id.* at 455. This Court does not understand that to mean that a dispute of material fact regarding whether a plaintiff voluntarily and knowingly signed a release is present in every case. The Plaintiff must present enough evidence to create an issue of fact which would preclude summary judgment. *See, Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, and *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202.

In *Riley*, a case more on point, the court found that in the circumstances of that case, where the language of the waiver is unambiguous, it is unnecessary to create a distinct federal body of law to interpret plaintiff's release of federal rights. *Riley v. American Family Mutual Insurance Company*, 881 F.2d 368, 373 (7th Cir.1989). The court then stated, however, that some inquiry must be made to determine whether the plaintiff's assent to the unambiguous language was knowing and voluntary to be consonant with the Supreme Court's decision in *Alexander.* 415 U.S. 36, 94 S.Ct. at 1011. The Seventh Circuit noted that:

> This court has defined the "knowing" requirement in the context of Title VII releases to mean " 'done voluntarily and purposefully, and not because of a mistake or accident.' " (Citations omitted).

*Id.* at 373.

Then, the court stated that a plaintiff who executes a release within the context of a settlement pursuant to the advice of independent counsel is presumed to have executed the document knowingly and voluntarily, absent claims of fraud or duress. *Id.* And, the court went on to note that:

Riley does not assert any fraudulent or coercive behavior on the part of the defendant *nor that she had an inadequate opportunity to consult with her attorney* or *that her attorney colluded with the defendant.* (Emphasis added).

*Id.* at 374.

In this case, there are no allegations of fraud; however, there are allegations of duress and allegations that the Plaintiff did not have an adequate opportunity to consult with an attorney. The duress claim will be addressed later. The question at this point is whether the Plaintiff had an adequate opportunity to consult with his attorney.

The Seventh Circuit gave no guidelines to determine when allowing the plaintiff an inadequate opportunity to consult an attorney would negate the presumption of a knowing and voluntary waiver. However, earlier in the opinion, the court cited standards used by several other circuit courts. The Seventh Circuit first cited *Pilon*, 710 F.2d 466, a case where the court rejected a totality of the circumstances approach to determine whether there was a knowing and voluntary waiver in the context of Title VII suits where the language of the waiver was unambiguous. *Id.* at 372. The Seventh Circuit, however, noted that the Eighth Circuit in *Pilon* refused to examine the subjective circumstances surrounding a plaintiff's release where the language of the release was unambiguous and the release was negotiated by the plaintiff's attorney. *Id.* at 372. In this case, although the language of the release was unambiguous, the Plaintiff's attorney did not negotiate the release. Contel basically gave Constant the release and told him to take it or leave it as it was.

The Seventh Circuit then noted that the Second and Third Circuits have endorsed a totality of the circumstances approach in assessing the contractual sufficiency of releases. The Seventh Circuit stated that among the factors found relevant to the inquiry by the Second and Third Circuits were:

(1) The plaintiff's education and business experience, (2) the amount of time the plaintiff had possession of or access to the agreement before signing it, (3) the role of the plaintiff in deciding the terms of the agreement, (4) the clarity of the agreement, (5) whether the plaintiff was represented by or consulted with an attorney, (6) whether an employer encouraged or discouraged the plaintiff to consult an attorney, and *(7) whether the plaintiff had a fair opportunity to consult an attorney.* (Emphasis added).

*Id.* at 372.

As noted in the background facts, the Plaintiff did have a college education; Plaintiff had 15 years of experience with Contel as an engineer; Plaintiff had possession and access to the release for a weekend and part of the next week; and the Plaintiff had the opportunity to change the name of the agreement from a "Termination Agreement" to a "Separation Agreement." The terms of the agreement are very clear, and the Plaintiff was represented by an attorney in deciding whether to sign the release. In fact, the Plaintiff was encouraged to seek and consult an attorney. However, there is some question whether or not the Plaintiff had a fair opportunity to consult with an attorney.

From the background facts, it is clear that the Defendants gave the Plaintiff a short period of time to get a legal opinion. However, the Defendants assert that Constant testified that he received at least a partial legal opinion from his attorney and that he did not attempt to get another legal opinion when his attorney stated that he was pressed for time even though he had the opportunity to get another attorney.

This Court agrees with the Defendant. Although the Plaintiff was given a relatively short time to get a legal opinion, he did obtain a legal opinion with which he was apparently satisfied. At the Plaintiff's deposition, the following exchange occurred when the Plaintiff was questioned by the Defendant's attorney:

Q. Then did he provide you with a legal opinion as to whether or not you should sign the agreement?

A. He just explained to me that since it was just a short time before this had

to be in, he suggested that I just—I explained to him that if I'm out of a job, I need money to live on. *So he said, "Well, I recommend you just go ahead and sign it."* He commented that he was pressed for him to give me a full legal opinion.

Q. So he did not suggest that you return the following day so that he could study the matter.

A. No. Not that I remember.

Q. He did not suggest that you return later that afternoon so that he could study the matter.

A. Not that I remember. No, sir.

Q. Did he say whether or not he reviewed the employee handbook?

A. I think he said he looked through it.

Q. Did he make any comment about anything in the employee handbook?

A. I don't remember if he made a comment to me. He might have asked questions to Elaine, or something. I don't know.

Q. I understand that. He didn't make any comment to you about the employee handbook, correct, that you remember?

A. That I remember, no.

Q. Did he comment to you about the language of the separation agreement, that is, the specific wording of it?

A. Not that I remember. No.

Q. Did you ask him to clarify the legal significance of anything stated in the agreement?

A. I probably did.

Q. Do you remember?

A. I don't know which parts, no.

Q. Would it be correct to assume that you then signed the agreement in his presence at the second session on Monday?

A. Yes, if that was the 6th.

Q. It was the 6th.

A. Okay.

Q. Did you seek a second opinion before you signed it?

A. No. This was Monday.

Q. All right. Monday, and you're in Carthage, correct?

A. Yes.

Q. And the agreement was due to Mr. Ellis by 5 p.m. on Tuesday, correct?

A. Yes.

Q. *Now, my question is, did you seek a second opinion before 5 p.m. on Tuesday?*

A. *No, sir.*

Q. *Why not?*

A. *I just figured, well, he was a good enough lawyer.*

Q. Okay. Anything else said in this second session?

A. Nothing that I remember. No.

Q. Okay. Would it be correct that you did not confer with Mr. Ancelet again that week concerning this matter.

A. I believe that to be true.

Q. Okay. Was that the last time in 1987 that you spoke to Mr. Ancelet or communicated with him concerning this matter?

A. Yes.

Q. Did you take the agreement with you when you left his office?

A. Yes.

Q. *Did you take it home, or did you then take it that day over to Carthage?*

A. *I think I just took it over to Paul.*

Q. *So you took it—did you deliver it to Paul Ellis on Monday, the 6th?*

A. *I believe that's when I took it over to him.*

Q. *Why didn't you hold on to it until the 7th so you could sleep·on it?*

A. *I don't have an answer for that.*

(Constant deposition at 159–162) (emphasis added).

As is clear from the Plaintiff's deposition testimony, the Plaintiff did not attempt to contact another attorney before the deadline even though he knew that his attorney was pressed for time. The Plaintiff did not attempt to contact another attorney because he figured that his attorney was "good enough." The Plaintiff returned the executed release a day early. As a matter of law, the Plaintiff is responsible for his choice of an attorney and for his failure to get the opinion of another attorney if he

was not satisfied with the opinion of his first attorney.

In sum, there is no disputed issue of material fact in this case whether or not the execution of the release was knowing and voluntary because the Plaintiff has not shown on the facts of this case that he had an inadequate opportunity to consult with an attorney.

### D. *Was There Consideration for the Release?*

■ Under federal law, releases of federal rights must be supported by consideration. *See, Riley,* 881 F.2d at 375.

The Defendants assert that, according to Bailey, the decision to provide severance or separation pay is wholly discretionary with the company; therefore, there was consideration in this case as the Defendants were under no obligation to provide separation pay.

However, as noted in this Court's statement of facts, the policy statement regarding the Company's separation pay policy provides that, if an employee is qualified, the employee will receive separation pay.

The policy clearly states that employees are not eligible for separation pay if they are separated due to resignation. The Defendants supported this proposition with evidence of another employee who resigned and did not receive separation pay. Since the Plaintiff has offered no evidence to the contrary, and the language of the separation policy is unambiguous, it is clear that the Plaintiff would not have qualified for separation pay in this case. Thus, the separation money paid to the Plaintiff constitutes consideration for the waiver signed by Plaintiff.

### E. *Is There a Disputed Issue of Material Fact as to Whether Duress Existed in this Case?*

■ The Plaintiff asserts that he was under medical, economic, and personal duress to sign the separation agreement.

In this case, the facts that could lead to an allegation of duress are that Constant was faced with the economic choice of either resigning his job, signing the separation agreement, and obtaining $22,000 in separation pay, or being discharged without any compensation.

Contrary to the Plaintiff's assertions, although the question of duress is a question for the fact finder, whether particular facts are sufficient to constitute duress is a matter of law for the Court. *Anselmo v. Manufacturers Life Insurance Company,* 771 F.2d 417, 419 (8th Cir.1985).

The economic duress alleged here is not duress at all because economic pressure is always present when someone is offered a large sum of money for a release. *Wittkoff v. U.S.G. Corporation,* 1989 W.L. 135242, Case No. 89–6004 (N.D.Ill., Oct. 23, 1989); *see also, EEOC v. American Express Publishing Corp.,* 681 F.Supp. 216, 219 (S.D.N.Y.1988) ("the fact that a party faces a difficult choice—between additional benefits or pursuing his legal rights—does not alone indicate lack of free will"); *Reed v. SmithKline Beckman Corp.,* 569 F.Supp. 672, 675 (E.D.Pa.1983) (economic or financial pressure is not adequate to invalidate a release).

In addition, the Plaintiff argued that he was under medical duress because he feared the loss of his health insurance benefits. However, as the Defendants note, the Plaintiff was offered health insurance continuation coverage for the monthly cost of $121 per month. (Bailey affidavit, Defendants' Exhibit A). In fact, the Defendants note that federal law requires employer to provide most separated employees with the option to continue their group health insurance coverage following an employee's termination. *See,* Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. § 1161 *et seq.* Even further, the Plaintiff has not supported the allegation that he was under medical duress except to state that he went to the Mayo Clinic for a health check-up.

The Plaintiff also alleges personal and other duress. However, as one court noted:

> Similarly, where the contracting party is free to come and go and to consult with counsel, there can be no duress in the

absence of threats of actual bodily harm. (Citations omitted).

*Reed,* 569 F.Supp. at 675. Further, although the Plaintiff asserts that there was a threat of criminal prosecution, there is no evidence to support this allegation. Thus, under the circumstances, the Court finds as a matter of law that there was no duress in this case.

**F.** *Is the Release Enforceable on the Independent Grounds that the Plaintiff Ratified it?*

 The Defendants argue that, even if the Plaintiff has created an issue of fact on another question in this case, the Plaintiff cannot sue because he ratified the release. The Defendants maintain that a party who accepts the benefits of a release is bound to its terms even where the person later alleges that the agreement was obtained through duress or other wrongful means. Thus, the Defendants claim that, because the Plaintiff accepted the settlement check, spent the money, and failed to inform Contel that he wanted to withdraw the settlement, Constant ratified the agreement and waived all claims. *See, DiMartino v. Hartford,* 636 F.Supp. 1241 (D.Conn.1986); *Anselmo,* 771 F.2d at 420; *American Express Publishing,* 681 F.Supp. at 219; *Dalessandro v. Monk,* 864 F.2d 6 (2nd Cir. 1988).

The Plaintiff argues that the same disputed facts as to lack of consideration, knowledge, and voluntariness raise a question whether or not there was ratification for the trier of fact. The Plaintiff contends that, if Constant was going to receive severance pay for his lengthy dedicated service, then there was no adequate consideration and no valid settlement. The Plaintiff argues that the cases cited by Defendants are distinguishable on this basis.

Further, the Plaintiff maintains that if he was entitled to the money, federal law would prohibit the release in any event. 26 C.F.R. § 1627.17(c)(i). The Plaintiff asserts that the need to live off the severance check during the next eight months shows necessity rather than ratification. The Plaintiff claims that summary judgment on a release question should be denied if fact questions as to voluntariness, time constraints, or ambiguity as to release language exists. *American Express Publishing,* 681 F.Supp. 216.

As stated earlier, because the Plaintiff resigned, the Plaintiff was not entitled to benefits under the separation policy under the plain language of the policy. The Plaintiff can make no arguments and has offered no evidence which would show that the Plaintiff qualified under this policy. Furthermore, the Federal Code of Regulations, 29 C.F.R. § 1627.17(c)(i), would not prohibit the release in this case. The section cited by the Plaintiff only defines contribution plans and does not prohibit releases. In fact, the section cited only defines what constitutes a contribution plan when separate accounts are maintained and when separate accounts are not maintained. The Plaintiff has provided no evidence in this case as to whether separate accounts were maintained or not, and the Plaintiff has made no argument why this would be relevant to this litigation.

Further, the case cited by the Plaintiff is inapplicable. The court in *American Express* found that summary judgment was inappropriate only because there was a dispute of material fact regarding whether the execution of the release was knowing and voluntary. 681 F.Supp. at 219–226. With regard to the ratification issue, the *American Express* court found that the release could not be set aside because of allegations of duress where the plaintiff had ratified the agreement by accepting benefits. *Id.* at 219. In other words, although ratification does not prevent a court from examining whether or not the release was executed knowingly and voluntarily, it does prevent a plaintiff from later raising allegations of duress. *See also, Anselmo,* 771 F.2d 420.

In this case, the Court has already determined that there is no dispute of material fact regarding the knowing and voluntary execution of the release; thus, a finding by this Court that the Plaintiff ratified the agreement in this case only provides an additional basis for dismissing the Plaintiff's allegations of duress.

## PENDENT PARTY JURISDICTION

As stated earlier, the Plaintiff sought relief in Count I against the Defendant Contel under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* Count II alleges a claim against Defendant Ed Bennett who was the Plaintiff's supervisor. The Plaintiff asserts that Bennett tortiously interfered with his contractual relations with Contel.

The question in this case is whether the Court has pendent party jurisdiction over the state law claim against Bennett. A two-part test must be satisfied before a district court can exercise pendent party jurisdiction. *Huffman v. Hains,* 865 F.2d 920, 922 (7th Cir.1989). In describing the factors which bear on the Court's decision to exercise its pendent party jurisdiction, the Seventh Circuit stated in *Huffman:*

> First, the court must examine whether the constitutional power to exercise such jurisdiction exists. Second, the court must examine whether Congress has limited the court's power to exercise pendent party jurisdiction in the specific statutory provision confronting federal jurisdiction in that case. (Citation omitted). The constitutional power to exercise pendent party jurisdiction exists if the federal claim is not frivolous, the federal and state claims "derive from a common nucleus of operative fact," and the federal and state claims are the kind that the plaintiff "would ordinarily be expected to try ... in one judicial proceeding." (Citations omitted). The statutory power to exercise pendent party jurisdiction depends upon whether "Congress in the [particular statutory grant at issue] has ... expressly or by implication negated" pendent party jurisdiction. (Citations omitted).

*Id.* at 922–923.

Although this Court granted summary judgment on the federal claim, it is clearly not a frivolous claim as the Court's earlier discussion indicates. Further, both the federal and state claims in this case derive from a common nucleus of operative facts and are claims that a plaintiff would ordinarily be expected to try in one judicial proceeding. Thus, this Court has the constitutional power to exercise jurisdiction over this claim.

■ The second factor in the *Huffman* test has been modified by a subsequent Supreme Court decision, however. *See, Finley v. United States,* 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989). In *Finley,* the plaintiff had sued the United States in federal court under the Federal Tort Claims Act for wrongful death. Later, the plaintiff moved to amend her complaint to add state tort law claims against the city and an electric company, claiming that their negligence had caused the death. No independent basis for federal jurisdiction against the city or the electric company existed. The district court allowed the joinder of the additional defendants as pendent parties. The Ninth Circuit reversed, holding that the Tort Claims Act does not permit pendent jurisdiction over additional parties.

In affirming the Ninth Circuit, the Supreme Court distinguished between pendent claim jurisdiction and pendent party jurisdiction. The Court acknowledged that *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) held that pendent claim jurisdiction over non-federal claims may exist where parties are litigating other matters properly before the federal court. However, the Court reasoned that pendent party jurisdiction is analytically and fundamentally different from pendent claim jurisdiction in stating:

> We may assume, without deciding, that constitutional criterion for pendent-party jurisdiction is analogous to the constitutional criterion for pendent-claim jurisdiction, and that petitioner's state-law claims pass that test. *Our cases show, however, that with respect to the addition of parties, as opposed to the addition of only claims, we will not assume that the full constitutional power has been congressionally authorized, and will not read jurisdiction statutes broadly.*

*Id.* 109 S.Ct. at 2006–2007 (emphasis added). The *Finley* Court then went on to quote from its decision in *Aldinger v. Ho-*

*ward*, 427 U.S. 1, 15, 96 S.Ct. 2413, 2420, 49 L.Ed.2d 276 (1976) the following:

"[T]he addition of a completely new party," we said, "would run counter to the well-established principle that federal courts ... are courts of limited jurisdiction marked out by Congress." (Citation omitted). "Resolution of a claim of pendent-party jurisdiction ... calls for careful attention to the relevant statutory language." (Citation omitted).

*Finley*, 109 S.Ct. at 2007.

Thus, the only question to be considered is whether the statutory language allows pendent party jurisdiction. This proposition is supported by the fact that the *Finley* court noted that mere factual similarity between the state and federal claims is of no consequence to determine this question because neither the convenience of the litigants nor considerations of judicial economy are sufficient to justify the extension of the ancillary jurisdiction. *Id.* at 2008. The *Finley* Court then focused on the actual language of the Federal Tort Claims Act in its analysis to determine whether the text of the jurisdictional statute in any way authorized the inclusion of private defendants. *Id.* at 2008–2010. After concluding that the statutory language did not extend to parties other than the United States, the Court found that pendent party jurisdiction was not available under the Tort Claims Act. *Id.* at 2010.

After *Finley*, federal courts have generally interpreted *Finley* to preclude pendent party jurisdiction unless there exists an independent jurisdictional basis for the pendent party. *Lather v. Beadle County*, 879 F.2d 365, 367–368 (8th Cir.1989); *Teledyne, Inc. v. Kone Corp.*, 892 F.2d 1404, 1407–1409 (9th Cir.1990); *Ezell v. Burlington Northern Railroad Company*, 724 F.Supp. 863, 864–865 (D.Wyo.1989). In fact, one federal court in a footnote went so far as to say that "pendent-party jurisdiction apparently is no longer a viable concept." *Staffer v. Bouchard Transportation Company*, 878 F.2d 638, 643, n. 5 (2nd Cir.1989). In addition, one prominent commentator stated:

It is possible to read *Finley* as only a construction of the Federal Tort Claims Act. Much of the opinion is devoted to an examination of that statute. So read the opinion would be fairly narrow, although it still would be contrary to the strong indication in *Aldinger* that pendent-party jurisdiction would be proper where, as in *FTCA*, federal jurisdiction is exclusive and a refusal to allow pendent-party jurisdiction would require separate suits in state and federal court. It seems clear, however, that this reading of *Finley* would be too narrow. A fair reading is that the court is distinguishing sharply between pendent claims and pendent parties. Although the *Finley* court assumes, without deciding, that pendent-party jurisdiction would be within the constitutional grant of judicial power, *it holds that "an affirmative grant of pendent-party jurisdiction" must be found in a statute. "[A] grant of jurisdiction over claims involving particular parties does not itself confer jurisdiction over additional claims by or against different parties."* There may be statutes that affirmatively grant pendent-party jurisdiction, but they surely must be exceptional. It is not surprising that lower courts are reading *Finley* as putting an end to that jurisdiction.

Wright, Miller & Cooper, *Federal Practice and Procedure:* Jurisdiction 2d, § 3567.2 (emphasis added).

The Plaintiff asserts that several district court cases subsequent to the *Finley* decision have allowed claims against pendent parties. *See, Armstrong v. Edelson*, 718 F.Supp. 1372, 1376–1377 (N.D.Ill.1989); *Carter v. Dixon*, 727 F.Supp. 478, 479–480 (N.D.Ill.1990); *Bailey v. City of Chicago*, 1990 WL 104048, No. 89–1021, slip op. (N.D.Ill., June 28, 1990); *Craig v. First American Capital Resources, Inc.*, 740 F.Supp. 530 (N.D.Ill.1990).

The three cases cited by the Plaintiff apply the second part of the *Huffman* test as if the Supreme Court had not decided *Finley*. In *Bailey*, the court stated that "the statutory power to exercise pendent party jurisdiction depends upon whether Congress in the particular statutory grant

at issue has expressly or by implication negated pendent party jurisdiction." *Bailey*, slip op.

In light of the express language of the *Finley* opinion, the subsequent interpretation of the *Finley* opinion by several circuit courts, and the interpretation of the *Finley* opinion given by a respected commentator, this Court believes that the second factor of the *Huffman* test has been modified by the *Finley* decision. This Court believes that a party must show an affirmative grant of jurisdiction under the relevant statute before a pendent party can acquire jurisdiction. It is insufficient to show merely that Congress has not expressly or by implication negated pendent party jurisdiction as the *Huffman* court required. Interpreting *Finley* so narrowly that it only has application to the Federal Tort Claims Act is untenable in light of the explicit language used by the Supreme Court distinguishing pendent party jurisdiction from pendent claim jurisdiction.

▇ Thus, the Plaintiff must show an independent basis for jurisdiction against the pendent party under the ADEA, 29 U.S.C. §§ 621 *et seq.*, to establish jurisdiction over the pendent claims. As the Plaintiff does not allege an independent basis for jurisdiction, and the Court cannot find an independent basis for jurisdiction under the jurisdictional section of the ADEA, 29 U.S.C. § 626(c), the Plaintiff's claim against Bennett, the pendent party, must be dismissed. The fact that all parties want this Court to hear this claim cannot change this result because this Court does not have subject matter jurisdiction over the state claim against the pendent party.

## CONCLUSION

In sum, the Court GRANTS the Defendant Contel's Motion for Summary Judgment (# 32) on Count I. The Court DISMISSES Count II of the Plaintiff's Complaint against Defendant Bennett as this Court lacks subject matter jurisdiction over the claims against Bennett.