No. 91-485

IN THE SUPREME COURT OF THE STATE OF MONTANA

1992

REVO SOMMERSILLE,

    Plaintiff and Appellant,

 -vs-

COLUMBIA FALLS ALUMINUM COMPANY, a Montana
corporation, JEROME BROUSSARD and BRACK DUKER,

    Defendants and Respondents.

FILED

NOV 4 - 1992

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM: District Court of the Eleventh Judicial District,
       In and for the County of Flathead,
       The Honorable Michael Keedy, Judge presiding.


COUNSEL OF RECORD:

   For Appellant:

     Allan M. McGarvey; McGarvey, Heberling, Sullivan &
     McGarvey, Kalispell, Montana

   For Respondent:

     Donald C. Robinson; Poore, Roth & Robinson,
     Butte, Montana.


         Submitted on Briefs: March 12, 1992

            Decided: November 4, 1992

Filed:

_____
       Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

Plaintiff, Revo Somersille, appeals from an order by the District Court of the Eleventh Judicial District, Flathead County, granting summary judgment to defendants, Columbia Falls Aluminum Company (CFAC). We affirm in part and reverse in part.

We state the issues as follows:

1. Was the "Termination Agreement" between plaintiff and CFAC a valid enforceable agreement?

2. Was the plaintiff barred under the Termination Agreement from claiming any additional share of profits for distribution after his termination from employment?

This case arose as a wrongful discharge action brought under the provisions of the Montana Wrongful Discharge from Employment Act, §§ 39-2-901, et seq., MCA. Plaintiff is a certified public accountant, and was the chief financial officer for CFAC. In September 1989, one year prior to the filing of the present action, CFAC furnished a proposed "Termination Agreement" to plaintiff for his consideration. During the next four weeks plaintiff reviewed such Agreement with his attorney and with his wife. He also negotiated several changes in the agreement. On September 29, 1989, he executed the revised Termination Agreement. The Termination Agreement included the following provisions:

1. Termination. Somersille's employment with the Company will be terminated effective September 30, 1989.

2. Compensation. Somersille shall be entitled to receive as severance pay

(1) his present salary through June 39, 1990; such

2

salary to be paid in three equal installments on November 15, 1989; February 15, 1990, and May 15, 1990, and

(2)     an amount equal to the profit sharing distribution to which Somersille normally would be entitled under the Company's profit sharing plan based on his employment from January 27, 1989 to September 30, 1989.  This profit sharing distribution will be made to Somersille at the time profit sharing distributions for 1989 are made to all employees, currently contemplated for January 1990.

3.     Medical Insurance.  For the eighteen months ended March 31, 1991, Somersille will be provided medical insurance under the Company's medical insurance policy in force at the time.  The cost of this insurance will be reimbursed to Somersille within two weeks of his paying the monthly premium due for such insurance.  In the event Somersille obtains medical insurance under another insurance plan, the Company's obligation to provide the aforesaid insurance will terminate upon the effective date of Somersille's new insurance.

4.     Medical Insurance for Wife.  At the end of the above eighteen-month period (March 31, 1991) and without limitation as to time, the Company will provide medical insurance to Somersille's current wife, Carmen, under the Company's medical insurance policy in force at the time. The Company will reimburse Somersille within two weeks of his paying the monthly premiums due for each insurance up to the cost of Plan 1, High Option Major Medical $500 deductible as provided for in the medical plan in effect at the time.  The Company's obligation to provide this insurance will terminate at the time of either his wife's death or at the effective date of new medical insurance coverage for Carmen Somersille.

7.     Waiver of Claims.  Both parties hereby waive and relinquish any and all claims, known and unknown, and do hereby mutually release and forever discharge one another, including all stockholders, directors and officers of the Company, from any and all actions, suits, debts, agreements, obligations, costs, expenses and other liabilities relating to Somersille's employment relationship with the Company.  The foregoing shall include, but not be limited to, any claim for past salary, wrongful termination or profit sharing.

Each party represents that it has had the opportunity to consult with an attorney, and has carefully read and understands the scope and effect of the provisions of this Agreement.  Neither party has relied upon any representations or statements made by the Agreement.  The parties agree that this Agreement is the

3

result of a compromise . . .

In accordance with the Termination Agreement, plaintiff's employment terminated September 30, 1989. CFAC paid plaintiff in excess of $48,000 as his present salary through June 30, 1990, under paragraph 2(1). In addition, on January 3, 1990, CFAC paid plaintiff $49,710 as the profit sharing distribution provided for under paragraph 2(2). Plaintiff also was reimbursed $4,320 for the cost of medical insurance under paragraph 3. As a result, plaintiff received over $102,000 under the terms of the Termination Agreement, and $15,000 relocation allowance remained available if he chose to relocate by June 30, 1991.

Approximately one year after his termination in September 1989, the plaintiff filed the present action. After CFAC filed a motion for summary judgment, plaintiff filed an amended complaint, alleging wrongful discharge, fraud, breach of contract, and other common law tort and contract claims. He also alleged that CFAC had breached its obligations under the profit sharing plan with its employees, and sought losses of profit sharing to which he was entitled both before and after his termination from employment date. With regard to the waiver of all claims set forth in paragraph 7 of the Termination Agreement, plaintiff contends the waiver should be set aside because it was fraudulently induced, in violation of public policy, and unconscionable. On August 13, 1991, the District Court granted defendants' motion for summary judgment. Plaintiff appeals.

4

I

Was the "Termination Agreement" between plaintiff and CFAC a valid enforceable agreement?

Plaintiff maintains that the release provision in the termination agreement was procured through fraudulent misrepresentation, undue influence and is unconscionable. He maintains that defendants falsely promised and misled him so as to cause him to believe that he had previously received his proper share of profit sharing with the intent to induce him to release them from any claims. Plaintiff further maintains that defendants used the fact that his wife was seriously ill as leverage in inducing him to sign the Termination Agreement. In his affidavit, plaintiff averred:

> 30. Defendants took advantage of my confidence and revelation of my wife's illness and the emotional and economic stresses of such illness by offering to continue my wife on the company health insurance coverage as described in the "Termination Agreement" if I would agree to sign such purported "Termination Agreement".

The District Court concluded there was no evidence of mistake, undue influence, menace or fraud in the record. It stated:

> Plaintiff Somersille consulted with an attorney and had discussed the agreement thoroughly with his wife before he signed it. Plaintiff had the agreement in his possession for review for almost a month. After he consulted with an attorney, he met and discussed the agreement again with company officials. He made specific proposals for inclusion in the agreement, some of which were agreed to by the company. Plaintiff insisted that the principal owner of the company sign the agreement, for additional security for himself. He discussed with his wife the consequences of signing the agreement. He was not under any other incapacity (drugs, physical duress, etc.) when he signed the agreement. He thoroughly read it and understood its terms. He was aware that in signing the agreement he was making a firm

5

agreement to not bring the suit which he now seeks to maintain. (Emphasis added.)

With specific regard to the element of fraud, the District Court further stated:

> The plaintiff in his affidavit has recited various facts which, he claims, give rise to an issue of fact over his claim that the Defendants engaged in fraud to induce him to sign the release agreement. However, it appears from his own deposition and affidavit that he was fully aware of the various incidents and occurrences, upon which he now relies to claim fraud, before he executed the release document . . . There is no evidence before the court which suggests that there was fraud on Defendants' part in inducing the Plaintiff to sign the termination agreement. Any "discrepancies" or irregularities of either party were known to the Plaintiff and waived by him when he signed the termination agreement containing the release of all claims.

The District Court then concluded that the execution of the release agreement was knowing and voluntary and fully ratified by him, stating:

> Again, to the extent that Plaintiff suggests that Defendants engaged in a violation of public policy in its pre-release conduct, those facts predated the signing of the release and were fully known to the Plaintiff when he consulted with legal counsel before signing the release.
>
> The Plaintiff's execution of the release document was knowing and voluntary, and was subsequently fully ratified by him when he accepted all of the monetary benefits of the Termination Agreement that were still being paid to him when he brought his suit. See Constant v. Continental Tel. Co., 745 F.Supp. 1374 (D. Ill. 1990). He should not be now allowed to engage in litigation to fully explore and develop the full dimensions of the potential claims which he was releasing when he executed the termination agreement.

Defendants maintain that plaintiff's voluntary relinquishment of all potential claims against CFAC precluded him from pursuing this action. Defendants maintain that plaintiff read and understood the terms of the Termination Agreement; thus, it is a

6

valid and enforceable contract entered into with the free and mutual consent of the parties. Defendants contend that the Utah Supreme Court case of Horgan v. Indus. Design Corp. (Utah 1982), 657 P.2d 751, is persuasive authority here.

In Horgan, a former employee brought an action against his former employer seeking to recover additional compensation following his termination and after he had signed an agreement by which he was paid stock redemptions, profit sharing, three months' termination pay, vacation pay, medical and health benefits, and other miscellaneous payments. The parties also signed a release precluding either party from ever asserting any employment-related claim against the other. Horgan claimed that the release was invalid because he signed it under duress as a result of the unexpected loss of his employment, thus negating the mutual assent necessary for a valid contract.

The Utah Court defined duress as "any wrongful act or threat which actually puts the victim in such fear as to compel him to act against his will". Horgan, 657 P.2d at 753. The Court went on to state that to constitute legal duress, the defendant must have acted against his will and have had no other viable alternative. Horgan, 657 P.2d at 754. The Court further stated that the "mere fact of an improvident or bad bargain or a feeling of latent discontent is not a sufficient basis to avoid the effect of an otherwise valid release." Horgan, 657 P.2d at 754. Thus, the Horgan Court concluded that the plaintiff did not sign the release under duress, but rather that he was someone who after signing, and

7

upon subsequent reflection, concluded he could have received more out of the agreement. Significantly, the Horgan Court also stated that "emotional distress is not the equivalent of duress and is inadequate to invalidate the release". Horgan, 657 P.2d at 753.

In arguing that he was unduly influenced, the plaintiff in this case contends that his wife's illness created emotional distress and increased financial demands, enhanced his need to remain in the same community, increased his dependence on the CFAC group health insurance plan, and enhanced the need to avoid further stress upon his family.

Plaintiff's arguments in support of undue influence parallel those made in the case of Horgan discussed above. His undue influence claim necessarily includes an argument of economic duress in this case. Thus, we will discuss the elements of both undue influence and economic duress.

Section 28-2-407, MCA, provides that undue influence consists of:

> (1) the use by one in whom a confidence is reposed by another or who holds a real or apparent authority over him of such confidence or authority for the purpose of obtaining an unfair advantage over him;
>
> (2) taking an unfair advantage of another's weakness of mind; or
>
> (3) taking a grossly oppressive and unfair advantage of another's necessities or distress.

Plaintiff has failed to present facts sufficient to demonstrate undue influence under the foregoing statute.

This Court has recently addressed economic duress in Hoven v. First Bank (N.A.)-Billings (1990), 244 Mont. 229, 234, 797 P.2d

915, 919, where we stated that the three elements of economic duress are (1) a wrongful act that; (2) overcomes the will of a person; (3) who has no adequate legal remedy to protect his interests. Plaintiff has failed to present facts demonstrating economic duress either under the Horgan test or the Hoven test.

In order to prove he was defrauded, plaintiff must prove all of the nine elements of fraud, including that he was ignorant of the falsity of any misrepresentations. See Batten v. Watts Cycle & Marine, Inc. (1989), 240 Mont. 113, 117, 783 P.2d 378, 380-81. As the District Court stated, the facts plaintiff relies on for his claims of fraud predated the signing of the release and were fully known to him when he consulted with his legal counsel before signing the release. We agree with the conclusion of the District Court that the plaintiff has failed to provide evidence of fraud sufficient to warrant a setting aside of the Termination Agreement.

Summary judgment is only proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), M.R.Civ.P. Any inferences to be drawn from the factual record must be resolved in favor of the party opposing summary judgment. Summary judgment is never a substitute for a trial on the merits. Boylan v. Van Dyke (1991), 247 Mont. 259, 266, 806 P.2d 1024, 1028. In granting summary judgment, the District Court held that by signing the Termination Agreement, plaintiff voluntarily relinquished all potential claims against CFAC and was precluded from bringing this action.

9

Plaintiff has failed to raise any issues of material fact with regard to his execution of the Termination Agreement. The District Court set forth its reasons for determining that the Termination Agreement was valid and enforceable. We agree with the District Court.

We hold that the Termination Agreement executed by plaintiff and CFAC was a valid enforceable agreement.

II

Was the plaintiff barred under the Termination Agreement from claiming any additional share of profits for distribution after his termination from employment?

Plaintiff claims an additional share of profits is due to him for distributions made prior to his termination from employment. As more fully appears in this part, we have concluded that plaintiff has failed to raise any issue of material fact with regard to such prior profit distributions, and that his claim in connection with such prior profit distributions is barred under his waiver of claims. As a result, this issue will be limited to consideration of the claimed share of profits which were to be distributed to the plaintiff after his termination from employment. Such profits were distributed during January 1990.

The record before us demonstrates that the Profit Sharing Plan covering all employees of CFAC in part provided:

> - The Board of Directors of the Columbia Falls Aluminum Company will determine each year the amount of profits available for distribution. Fifty percent of the distributable profits as determined by the parent company will be distributed to employees.

10

- The profit sharing pool will be divided among the salaried and hourly groups based on the ratio of each group's pay to total pay.

- The resultant salaried profit sharing will be further divided among all salaried employees who were employed on the last day of the fiscal year, using a ratio of the individual's fiscal year-to-date pay to the total covered salaried payroll for the fiscal period.

- The salaried employees will be given a choice of cash or deferral (in 25% increments). If cash, it will be taxed as ordinary income. If deferred, tax is delayed until money is received. The deferral amounts will be held in a separate account within the new savings plan. It will be a 401(k)-type contribution: unavailable for withdrawal, 100% (sic) vested, and subject to the discrimination tests of 401(k).

- The resultant hourly profit sharing pool will be further divided among all hourly employees, in a manner to be determined by the company and the union.

Plaintiff maintains that in January 1990, he was to have received the profit sharing to which he was entitled under the promises of the employment contract, Profit Sharing Plan and Termination Agreement. He maintains that instead, he received a profit sharing distribution payment which reflected a profit sharing declaration which was disproportionately small. He further maintains that he did not become aware that the profit sharing distribution was disproportionate to the profit sharing expected until the post-termination distribution in January 1990. In his affidavit filed in support of his opposition to summary judgment, plaintiff averred the following:

20. Contemporaneous with the calculation declaration and distribution in January and February of 1989, very large sums of money were transferred to Los Angeles, out of the control or record of my office such that I was unable to determine whether profits distributable and/or actually distributed were equally divided between employees and employers.

11

21. Subsequent declarations and distributions of profit sharing do not appear to be proportionate to the vast sums of money, profits and cash transferred from Columbia Falls to the Los Angeles office.

23. The only way to actually determine whether the profit sharing paid to CFAC employees is equal to the profit sharing promised would be to examine financial documents of the company that demonstrate actual profits, actual distributions (in any form) to owners, actual profit sharing payments, actual loans and interest on loans to owners or their interests and actual FICA and other tax payments, agreements and withholdings. Without such documents and evidence it would be impossible for me to give or secure an affidavit establishing the degree of discrepancy between profit sharing promised and profit sharing paid.

In considering the execution of the Termination Agreement with the release contained in paragraph 7, the District Court in its Order stated:

> Plaintiff's signature on the Termination Agreement represents his consent and agreement to enter into a valid and enforceable contract. For the valuable and considerable consideration of over $100,000 in compensation and benefits plaintiff agreed that he would "waive and relinquish any and <u>all</u> claims . . ." (Emphasis supplied) that he had against the defendant. He further agreed to "release and forever discharge" the defendant "from any and all actions, suits . . . and other liabilities relating to his employment relationship" with the company. Specifically, it was agreed that such release included a release of all claims arising from "wrongful termination" as well as past salary and specifically including "profit sharing."
>
> Plaintiff's voluntary relinquishment of all potential claims against Defendant precludes him from pursuing this action. Because there are now no factual disputes before this Court as to any material issue, and the release affirmatively discharges any potential liability the defendant may have incurred because of Plaintiff's termination, as a matter of law summary judgment should be granted in favor of Defendant.

We conclude that the District Court's analysis is appropriate with regard to profit sharing to be paid for years prior to the termination of plaintiff's employment. However, there are

12

additional elements which the District Court did not consider with regard to the profit sharing distribution made in January 1990 to the plaintiff.

The District Court properly referred to paragraph 7 of the Termination Agreement which in pertinent part provided:

> 7. <u>Waiver of claims</u>. Both parties hereby waive and relinquish any and all claims, known and unknown, and do hereby mutually release and forever discharge one another . . . from all actions, suits, debts, agreements, obligations, costs, expenses and other liabilities relating to Somersille's employment relationship with the Company. The foregoing shall include, but not limited to, any claim for past salary, wrongful termination or profit sharing.

The District Court then relied upon the foregoing waiver of claims and concluded that plaintiff's claim for additional profit sharing to be distributed in January 1990 was clearly relinquished. In reaching that conclusion, the court did not consider the following pertinent portion of the Termination Agreement:

> 2. <u>Compensation</u>. Somersille shall be entitled to receive as severance pay
>
> . . .
>
> (2) an amount equal to the profit sharing distribution to which Somersille normally would be entitled under the Company's profit sharing plan based on his employment from January 27, 1989 to September 30, 1989. This profit sharing distribution will be made to Somersille at the time profit sharing distributions for 1989 are made to all employees, currently contemplated for January 1990.

While it is true that the waiver of all claims contained in paragraph 7 clearly applied to all profit sharing which had been made by the defendant prior to the termination of plaintiff's employment, a different approach is required for the January 1990

13

distribution. In connection with that distribution, we conclude that both of the foregoing paragraphs 2 and 7 of the Termination Agreement must be considered. While it is true that the waiver is broad enough to cover all profit sharing in general terminology, we have the companion agreement by the defendant to pay Sommersille an amount equal to the profit sharing distribution he normally would have been entitled to for his employment from January 27, 1989 to September 30, 1989, the date of his termination. The paragraph on waiver of claims should not be construed to include the consideration specifically provided for him under paragraph 2. By signing the Termination Agreement plaintiff should not be considered to have foreclosed his right to sue for the consideration he claims was to be furnished to him under paragraph 2.

The amount to be paid under paragraph 2 of the Termination Agreement was unknown to both the plaintiff and the defendant on the date of employment termination. Clearly the intent of the parties was that by January 1990, several months after plaintiff's termination of employment, the defendant would calculate and pay the profit sharing payment to the plaintiff. In substance the Profit Sharing Plan required that 50 percent of the distributable profits as determined by the parent company, be distributed to the employees, with the division to be made among the various groups based upon the ratios of each group's pay to the total pay. By his affidavits plaintiff has raised an issue of fact as to whether the profit sharing distribution actually made was incorrectly

14

calculated and therefore disproportionately small. Plaintiff has also raised an issue of fact as to his contention that he did not become aware of the disproportionate nature of the profit sharing distribution until the actual distribution in January of 1990.

We conclude that plaintiff has raised issues of material fact with regard to the January 1990 profit distribution to the plaintiff. We therefore reverse the judgment insofar as it precluded the claim for profit sharing distribution contemplated for January 1990, and covering the period of plaintiff's employment in 1989.

We therefore affirm on Issue I holding that the Termination Agreement was a valid enforceable agreement, and reverse and remand on Issue II for further proceedings consistent with this opinion.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

_____
District Judge Jeffrey Sherlock
sitting for Justice Trieweiler

15

November 4, 1992

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:


La Rue Smith
Attorney at Law
606-5th Ave. No.
Great Falls, MT  59401

Gorham E. Swanberg
Swanberg, Koby & Swanberg
P.O. Box 2567
Great Falls, MT  59403


ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
Deputy