John P. CARROLL, et al., Plaintiffs,

v.

PRIMERICA FINANCIAL SERVICES
INSURANCE MARKETING,
Defendant.

No. 1:92–CV–413–RHH.

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 10, 1992.

Robert C.D. McDonald, Norcross, GA, for plaintiffs.

Weyman Thompson Johnson, Jr., Paul Hastings Janofsky & Walker, Atlanta, GA, for defendant.

## ORDER

ROBERT H. HALL, District Judge.

This case is before the Court on Plaintiffs' Motion to Dismiss Defendant's Counterclaim [5], Defendant's Cross–Motion for Summary Judgment, or, in the alternative, Motion for Separate Trials [6], and Plaintiffs' Motion for Extension of Time to Reply to Defendant's Response to Plaintiffs' Motion to Dismiss; and to Respond to Defendant's Cross–Motion for Summary Judgment, or, in the alternative, Motion for Separate Trials [9]. This Court has jurisdiction pursuant to 29 U.S.C. § 633a(c). The Court GRANTS Plaintiff's Motion for Extension of Time, GRANTS Plaintiff's Motion to Dismiss, GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment, and GRANTS Defendant's Motion, in the alternative, for Separate Trials.

## BACKGROUND

Plaintiffs, John P. Carroll, Tom Adair, Rhea Crowe, Joan Holt, and George Tlapa, all former employees of Defendant, PFS Primerica Corporation (erroneously named in Plaintiffs' Complaint as Primerica Financial Services Insurance Marketing), are suing Defendant for terminating their employments on August 27 or 28, 1990, allegedly in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* To properly address Plaintiffs' claims and both parties' motions, the Court will first review the conditions of employment that Defendant memorialized and transmitted to Plaintiffs in writing, and then it will recount the events surrounding each Plaintiff's termination.

I. Conditions of Employment and Release-of-Liability Forms.

Plaintiffs have entered into evidence a copy of three pages from what they allege to be Defendant's "Employee Handbook". Plaintiff's Motion to Dismiss, p. 5 & Exhibit A; Plaintiff's Reply, pp. 4–5 & Exhibit F [10]. Those pages announce their effective date as July 1, 1989, and Defendant confirms that they became effective on that date. Defendant's Cross–Motion, p. 7. [6].

One of the pages is numerated "Policy: A1", and has a header stating "Employee Handbook" (hereinafter this page will be referred to as "page A1"). [10–Exhibit F]. Item C on page A1 states: "As revisions are made and this handbook is reprinted, updates will be distributed to all employees." Another of the pages is numerated "Policy: D5", and has a header stating: "Severance Pay in Lieu of Notification of Termination" (hereinafter this page will be referred to as "page D5"). [5–Exhibit A]. The final page is merely a continuation of the text from page D5. This final page has no header or numeration (hereinafter, this page will also be referred to as "page D5").

Page D5 sets out the formulas for calculating employees' severance payments in the event they are not given two weeks notice of impending termination. Page D5 also presents four conditions under which employees will be ineligible for severance payments. Failure to sign a release-of-liability form (a "release") is not one of these conditions, nor is such a form mentioned anywhere on the page. Furthermore, neither page states that Defendant has the power to change, without notice, any of its terms. The headers on page A1 and page D5 are both blocked off by an identical graphic style, and the pages' typesets are the same.

Defendant has entered into evidence a copy of a page from what it alleges is its "Policies and Procedures Handbook". Defendant's Response/Motion, pp. 6–7, Exhibit F. [6]. This page has no numeration, but has a header stating "Introduction" (hereinafter, this page will be referred to as "page intro"). The header's graphic style is different from that on pages A1 and D5, as is the typeset. Page intro states:

The contents of the manual are presented as a matter of information only. While the Corporation believes wholeheartedly in the policies described herein, they are not conditions of employment. The Corporation reserves the right to modify, revoke, suspend, terminate, or change any or all policies and proce-

dures, in whole or in part, at any time, with or without notice.

Defendant asserts that through this quoted language it had reserved the right to modify the severance pay provisions on page D5 at any time, with or without notice to its employees. Defendant further alleges, through its Senior Vice President for Human Resources, that, pursuant to this right, "[i]n August 1990, the Company modified the severance pay policy to provide that an employee becomes eligible to receive separation pay benefits upon involuntary termination of employment resulting from a reduction in force *and execution of an agreement releasing the Company from liability.*" Turnage Affidavit, ¶ 7 (appended to Defendant's Cross–Motion) (emphasis added).

Plaintiffs each signed a "release" in which they agreed that in consideration for Defendant providing them with various benefits (discussed in greater detail below), they fully waived Defendant's liability to any claims· they may have against Defendant "as a result of actions or omissions occurring through [the date the release is signed]." *E.g.*, Answer, Exhibit B. [3].

## II. Plaintiffs' Terminations.

### A. *John P. Carroll.*

John Carroll was employed by Defendant from August 6, 1980 through August 27, 1990 as Director of Communications. His job duties included preparing field bulletins and manuals, and reviewing regulatory forms and correspondences related to products sold by an affiliated company (MILICO). Carroll alleges that on Monday, August 27, 1990, at approximately 3:30 p.m. he was informed of his termination. He was 62 years old. At that time, one of Defendant's executive officers, Bob Van Sant, gave him a release and allegedly told him "[u]nless the release is signed, there won't be any termination benefits." Carroll Affidavit, p. 1 [10–Exhibit A]. On Friday, August 31, 1990, Carroll signed the release.

The terms of Carroll's release provided him, in consideration for his waiver of Defendant's liability: 15 weeks severance pay (the full amount to which he was entitled under the formula set forth on page D5); the choice between an additional separation payment of $2,500 or temporary coverage under Defendant's health insurance program in accordance with the Consolidated Omnibus Budget Reconciliation Act of 1987 ("COBRA") with Defendant paying Carroll's premiums—Carroll chose the lump sum; resume/interviewing services; and neutral references in response to inquiries from potential employers.

Plaintiffs allege that following Carroll's termination, Defendant reorganized its operations and transferred Carroll's former duties to other employees, who had less experience, and were outside the category of people protected by ADEA.

### B. *Tom Adair.*

Tom Adair was employed by Defendant from October 12, 1987 through August 27, 1990, serving as Director of the Health Claims Department since February 16, 1990. Adair alleges that on Monday, August 27, 1990, at approximately 12:00 noon, he was informed of his termination. He was approximately 42 years old. At that time, Defendant's Vice–President in charge of Human Resources, Linda Diaz, gave him a release and allegedly told him that he had to sign the release in order to receive any benefits. On Thursday morning, August 30, 1990, Adair signed the release.

The terms of Adair's release provided him: the full amount of severance pay to which he was entitled under the formula set forth on page D5; the choice between a payment of $2,500 or continued health coverage in accordance with COBRA with Defendant paying his premiums—Adair chose the continued coverage; resume/interviewing services; and neutral references in response to inquiries from potential employers.

Plaintiffs allege that following Adair's termination, Defendant transferred a majority of Adair's former duties to another employee outside of the protected age category.

## C. *Rhea Crowe.*

Rhea Crowe was employed by Defendant from July 1, 1987 through August 27, 1990, first as a Vice President and Executive Director, then as Marketing Director of MILICO's Accident & Health Division, and finally as President of the Consumer Association. As President of the Consumer Association, Crowe's duties included soliciting products and services, and managing new business. Crowe alleges that on Monday, August 27, 1990, at approximately 4:00 p.m. he was informed of his termination. He was 67 years old. At that time, one of Defendant's Human Resources personnel, Sidney Ogletree, gave him a release and allegedly told him that the release must be signed by the end of the week or the benefits would no longer be offered. On Thursday, August 30, 1992 Crowe signed the release.

The terms of Crowe's release provided him with: the full amount of severance pay to which he was entitled under the formula set forth on page D5; and the choice between a payment of $4,500 or continued health coverage in accordance with COBRA, with Defendant paying his premiums, or outplacement services—Crowe chose the lump sum payment.

Plaintiffs allege that following Crowe's termination, Defendant transferred a majority of Crowe's former duties to another employee outside of the protected age category.

## D. *Joan Holt.*

Joan Holt was employed by Defendant from December 1, 1983 through August 28, 1990 in various positions, the most recent of which was manager of the Cancellations Unit of the Policyowner Service Department. Holt alleges that on Tuesday, August 28, 1990, at approximately 2:30 p.m. she was informed of her termination. She was approximately 52 years old. At that time, one of Defendant's Human Resources representatives, Bonnie Catall, gave her a release and allegedly told her "[i]f you sign the release today, you will get your money. If you don't sign, you won't get anything." Holt Affidavit, p. 1 [10–Exhibit D]. On that same day, Tuesday, August 28, 1990, Holt signed the release.

The terms of Holt's release provided her: the full amount of severance pay to which she was entitled under the formula set forth on page D5; an additional separation payment of $500; resume/interviewing services; and neutral references in response to inquiries from potential employers.

Plaintiffs allege that following Holt's termination, Defendant transferred her former duties to other employees who had less experience, and were outside the protected age category.

## E. *George Tlapa.*

George Tlapa was employed by Defendant, or its parent company, from December 1, 1972 through August 27, 1990, serving since 1986 as Vice President of Life Claims for MILICO. Tlapa alleges that on Monday, August 27, 1990, at approximately 4:30 p.m. he was informed of his termination. He was approximately 50 years old. At the time, Mr. Van Zant gave him a release and one of Defendant's Human Resources representatives told him that if he did not sign the release he "would not get any of [his] benefits." Tlapa Affidavit, p. 2 [10–Exhibit E]. On Friday, August 31, 1990, Tlapa signed the release.

The terms of Tlapa's release provided him: the full amount of severance pay to which he was entitled under the formula set forth on page D5; and the choice between an additional separation payment of $4,500, continued health insurance coverage in accordance with COBRA, with Defendant paying his premiums, or outplacement services—Tlapa chose the insurance coverage.

Plaintiffs allege that following Tlapa's termination, Defendant transferred Tlapa's former duties to other employees, who had less experience, and were outside the protected age category.

Plaintiffs filed their Complaint on February 20, 1992, and amended it on June 12, 1992, alleging that Defendant terminated each of them due to their age, in violation of ADEA. Defendant filed a Counterclaim

on July 2, 1992 alleging that, by filing an ADEA action against Defendant based on terminations that occurred prior to their signing the releases, Plaintiff's were in breach of contract, and Defendant was entitled to damages. On August 5, 1992, Plaintiffs moved the Court to dismiss Defendant's Counterclaim. On August 24, 1992, Defendant cross-moved the Court to grant it summary judgment on Plaintiffs' claims and its own counterclaim, or, in the alternative, to hold a separate trial on the status of the releases. Finally, on September 14, 1992, Plaintiffs moved the Court for an extension of time in which to file a reply to Defendant's Response to Plaintiff's Motion to Dismiss; and a Response to Defendant's Cross–Motion for Summary Judgment, or, in the alternative, for Separate Trials.

## DISCUSSION

I. Plaintiffs' Motion for Extension of Time.

■ Plaintiffs have moved the Court to grant them an extension until September 25, 1992 to file two responsive pleadings. In support of their motion, Plaintiffs informed the Court that their attorneys were involved in two separate trials during the two weeks preceding the original due date. In light of the Court's inherent power to police its own docket, *see Mingo v. Sugar Cane Growers Co-op*, 864 F.2d 101, 102 (11th Cir.1989), and the lack of any opposition from Defendant, the Court grants Plaintiffs' motion.

II. Motion to Dismiss and Motion for Summary Judgment.

A. *Standard of Review.*

This Court will grant summary judgment when "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Where the movant is the defendant, that party must demonstrate that the nonmoving party, the plaintiff, lacks evidence to support an essential element of her or his claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct.

2548, 2553, 91 L.Ed.2d 265 (1986), *cert. denied*, 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988). In contrast, where the movant is the plaintiff, that party must demonstrate the absence of an issue of material fact with regard to *every* element essential to his or her claim. *See id.* The movant's burden is "discharged by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* However, it is not enough in most situations for the movant merely to point out to the court this absence of evidence. *Id.* 477 U.S. at 323, 106 S.Ct. at 2552; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). Rather, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(c)).

■ Only after the movant meets its initial burden does any obligation on the part of the nonmovant arise. *Id.; Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *Clark*, 929 F.2d at 608. Nevertheless, once the movant has met this initial burden, the opposing party must present evidence establishing a material issue of fact. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553. The nonmoving party must go "beyond the pleadings" and present evidence designating "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553.

■ All evidence and factual inferences should be viewed in the light most favorable to the nonmoving party. *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir. 1987); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir.1987). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). An issue is not genuine if it is unsupported by evidence or is created by evidence that is "merely colorable" or "not significantly probative." *Id.* at 250, 106 S.Ct. at 2511. Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case. *Id.* at 248, 106 S.Ct. at 2510. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of every element essential to his or her case so as to create a *genuine* issue for trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552; *Rollins,* 833 F.2d at 1528.

In support of their Motion to Dismiss for failure to state a claim, Plaintiffs provide the Court with affidavits and copies of pages from Defendant's Employee Handbook. Because the Court does not exclude these matters outside the pleadings, it will treat Plaintiffs' motion as one for summary judgment. *See* Fed.R.Civ.P. 12(b).

### B. *Validity of the Release.*
#### 1. Consideration.

Plaintiffs assert that they are not bound by the terms of the releases they signed because the releases were not valid contracts due to an alleged lack of consideration from the Defendant. According to Plaintiffs, the releases lacked consideration because in exchange for Plaintiffs' waivers of Defendant's liability, Defendant agreed to provide them with severance-pay benefits it was already obligated to provide under the terms listed on page D5 of their Employee Handbooks. Defendant counters that, in accordance with its powers described on page intro, it changed the terms of page D5 so that severance pay was available only upon signing the releases, and, therefore, consideration did exist. Furthermore, Defendant argues, notwithstanding any preexisting obligation to provide severance pay, its provision of resume/interviewing services and lump sum payments or payments of premiums for continued health coverage, serve as sufficient consideration to support the contract.

■ The Court finds, as a preliminary matter, that Defendant was entitled, under the terms of the Company's Policies and Procedures Handbook, to change the severance pay policy without notice to Plaintiffs. Although the typesets and the headings' graphics on page intro and page D5 are dissimilar, and page intro refers to the contents of "the manual", while page D5 refers to itself as the "handbook", Michael Turnage, Defendant's Vice President of Human Resources, testified in his affidavit that both pages are contained in the Company's Policies and Procedures Handbook. Because Plaintiffs have failed to offer any convincing reason to believe that Defendant lacks evidence to support this assertion, the Court must conclude that the power granted Defendant in page intro extends to the terms found in page D5.

■ The Court also finds, however, that Defendant lacks evidence to support its assertion that it had changed the terms on page D5 to make provision of severance pay contingent upon execution of a release. Defendant offers no memorialization of such a change. More importantly, Turnage, in his affidavit, states only that "[i]n August 1990, the Company modified the severance pay policy...." *Id.* at ¶ 7. As Plaintiffs point out in their reply brief, Turnage fails to provide the specific date upon which this change was made. In light of the fact that each of the plaintiffs signed their respective releases prior to the end of the month of August, 1990, it is possible, and not contrary to Turnage's testimony, that the policy change was made *after* each of the plaintiffs signed their releases. If this in fact occurred, then Plaintiffs would not be bound by the subsequent requirement that they sign the releases in order to receive severance pay benefits. The Court, therefore, finds that a genuine issue exists as to whether Plaintiffs were entitled automatically to the severance pay they received upon their terminations.

■ Defendant contends that even if its severance payments do not constitute con-

sideration, its offer of either an additional lump sum payment or payment of health insurance premiums under COBRA do. Recipients of health plan benefits under ERISA are entitled to continued coverage under their plans for a certain length of time following most job terminations. 29 U.S.C. § 1161. As part of a continuation of coverage, an employer may require its former employees to pay the plan's premiums. *Id.* § 1162(3). Plaintiffs have offered no evidence suggesting that Defendant was obligated under federal law or company policy to cover former employees' premiums following job termination. Therefore, Defendant's payment of either a lump sum or continued health insurance premiums constitutes consideration for Plaintiffs signing the releases.

Plaintiffs agreed to receive the following from Defendant in exchange for releasing it from liability: Carroll—lump sum payment of $2,500; Adair—payment of health plan premiums; Crowe—lump sum payment of $4,500; Holt—lump sum payment of $500; Tlapa—payment of health plan premiums. These payments were not required prior to Plaintiffs' signing the releases, and coupled with the resume/interviewing services, constitute consideration for same.

2. Knowing and Voluntary Release.

■ Plaintiffs argue next that they did not "knowingly and voluntarily" execute the releases, and, therefore, the releases are not valid. The Court of Appeals for the Eleventh Circuit has delineated a nonexhaustive list of factors to guide lower courts in determining whether ADEA releases have been signed knowingly and voluntarily. These factors include:

■ the plaintiff's education and business experience, [2] the amount of time he or she had to consider the agreement, [3] the clarity of the agreement, [4] whether the plaintiff consulted an attorney or had a fair opportunity to do so, [5] whether the employer encouraged or discouraged the employee to consult an attorney, and [6] whether the consideration given in exchange for the waiver exceeds the benefits to which the employee was already entitled.

*Gormin v. Brown–Forman Corp.*, 963 F.2d 323, 327 (11th Cir.1992).

Plaintiffs do not contest that they each had sufficient education and business experience to adequately evaluate the releases they were asked to sign, nor do they contest the clarity of the agreement. Furthermore, the Court has found that the consideration given in exchange for the waiver exceeds the benefits to which the plaintiffs were already entitled. Plaintiffs do assert, however, that they were not given adequate time to consider the agreement, and that they were not given a fair opportunity to consult with an attorney.

There is no case law in this circuit nor any other circuit setting out a bright-line test for determining what is a sufficient amount of time for an employee to consider a release and consult with an attorney before one is considered to have signed a release knowingly and voluntarily. A sampling of cases that have addressed the question offers some guidance. *See, e.g., Constant v. Continental Tel. Co.*, 745 F.Supp. 1374, 1382 (C.D.Ill.1990) (finding that although the time period between the Friday upon which the employee received the release form and the Tuesday by which he was required to sign it was a "relatively short time," the fact that the employee was able to obtain legal advice with which he was apparently satisfied made his signing of the release knowing and voluntary); *Mullen v. New Jersey Steel Corp.*, 733 F.Supp. 1534, 1544–45 (D.N.J.1990) (finding that employee's signing of a release was knowing and voluntary in light of the fact that he had fourteen days to consider the release, and opportunity to negotiate its terms); *Pears v. Spang*, 718 F.Supp. 441, 446 (W.D.Pa.1989) (finding that because the defendant had no deadline by which plaintiff was required to sign the release, the fact that she signed the release within "several days" did not make her signing unknowing or involuntary); *Vaughn v. Mobil Oil Corp.*, 708 F.Supp. 595, 603 (S.D.N.Y.1989) (finding that three months to consider release's terms is more than sufficient); *E.E.O.C. v. American Express Pub. Corp.*, 681 F.Supp. 216, 220 (S.D.N.Y.

1988) (finding that "[t]hree days, while not conclusive as to involuntariness, is sufficiently short to create a question on the subject [for summary judgment purposes]").

In the instant case, Carroll, Adair, Crowe and Tlapa were each given the release on Monday, August 27, 1990, and Holt was given it on Tuesday, August 28, 1990. Turnage testified that each plaintiff had until Friday, August 31, 1990 to sign the release in order to receive the enumerated benefits. Turnage Affidavit, ¶ 13. Tlapa and Crowe admitted in their affidavits that they were explicitly given until Friday, August 31, 1990 to sign the releases, and Carroll and Adair did not mention any due date. Holt, however, testified that when she was given the release, she was told to sign it that day or she wouldn't get any benefits. Holt Affidavit, p. 1. Each release stated that "[t]he undersigned understands and acknowledges: ... (4) that the undersigned understood that he or she was free to consult with anyone he or she desired, including an attorney, prior to signing this Agreement and Release."

Each plaintiff testified that he or she was stunned or in shock upon learning of his or her termination, and didn't feel he or she had any choice but to sign the release. None of the plaintiffs consulted an attorney before signing the release, but neither did any of them allege that they were dissuaded or impeded from consulting an attorney, except for Tlapa who suggested that he did not have time to meet with an attorney, but admitted that he "did not even consider trying to contact" one. Tlapa Affidavit, p. 2. In light of these facts, the Court finds that there is a question as to whether Holt was given three full days or less than one day to sign her release. If she was given only one, then there is indeed a genuine issue as to whether she was given sufficient time. As for the remaining plaintiffs, the Court finds that they were given sufficient time to consider the releases and attempt to meet with an attorney. Had any of the Plaintiff testified that he tried to meet with an attorney but was unable to do so due to the limited amount of time provided, there might have been a question as to the validity of the releases. Absent such testimony, however, the Court must assume that Plaintiffs voluntarily chose to forgo such consultations.

3. Prospective Application.

■ Plaintiffs argue, finally, that even if the releases are valid, they do not release Defendant from liability in this suit because Defendant's allegedly discriminatory intent became apparent only after August 31, 1990, when it hired people outside of ADEA's protected age category to assume Plaintiffs' duties. Plaintiffs assert that because some courts toll the running of the statute of limitations on Title VII cases until the facts which would support a cause of action are, or should be, apparent, this Court should not find that Defendant's allegedly violative actions occurred before August 31, 1990 because its alleged intent to discriminate was not apparent until after that date.

The law is clear that an ADEA cause of action accrues in a job termination situation at the time of the termination, not at some later time when the intent behind the termination becomes sufficiently apparent. *See* 29 U.S.C. § 623(a) ("It shall be unlawful for an employer—(1) to fail or refuse to hire or to discharge any individual ... because of such individual's age; ...."); *United States v. Allegheny–Ludlum Indus., Inc.,* 517 F.2d 826, 855 (5th Cir.1975) (finding that a release inoculates the defendant unless it engages in *new* discrimination after its signing) (emphasis added), *cert. denied sub nom. National Organization for Women, Inc. v. United States,* 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976). Plaintiffs' suit, therefore, is barred by the releases except to the extent that the releases are themselves void. Because a genuine issue exists only as to whether Holt's release was signed knowingly and voluntarily, the Court grants Defendant's Motion for Summary Judgment as to each plaintiff except Holt.

C. *Defendant's Motion for Separate Trials.*

■ Federal Rule of Civil Procedure 42(b) provides:

The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaims, third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

The Court finds that conducting separate trials on the issues of the validity of Holt's release and her ADEA claim would serve all three of Rule 42(a)'s goals. If a jury were to find that Holt's release is not valid, there would be no need for a full trial on the merits of her ADEA claim. Addressing this question first in a separate trial could eliminate the need for both parties to spend large sums of money and many hours preparing to argue the implications of Defendant's corporate reorganization. In addition, the conditions under which Holt signed her release are unrelated to the facts surrounding Defendant's alleged ADEA claim. Holding two separate trials will not require any duplicative work by either party. Finally, there is the possibility that having a jury consider both issues together may prejudice Defendant's case with regard to the validity of Holt's release. For these reasons, the Court grants Defendant's Motion for Separate Trials.

III. Plaintiff's Motion to Dismiss Defendant's Counterclaim.

A. *Standard of Review for Motion to Dismiss.*

The Court, in consideration of a Rule 12(b)(6) motion, may look only at the pleadings. *See* Fed.R.Civ.P. 12(b). The Rule allows dismissal of a complaint which fails "to state a claim upon which relief can be granted." *Id.* When faced with a motion to dismiss under Rule 12(b)(6), the Court construes the complaint broadly, accepting all facts pleaded therein as true and viewing all inferences in a light most favorable to the plaintiff. *Cooper v. Pate,* 378 U.S.

546, 546, 84 S.Ct. 1733, 1733, 12 L.Ed.2d 1030 (1964).

B. *Application.*

Each release signed by the Plaintiffs contained the following statement:

In consideration of the above provisions, the undersigned fully waives and releases ... any and all claims, demands, [and] causes of action ... against the Company.... The undersigned also agrees not to institute administrative proceedings or a lawsuit against [the Company] in regard to any claims, demands, [or] causes of action ... referred to above....

Answer, Exhibits A–E. Defendant contends that Plaintiffs are in breach of this agreement, and, as such, are liable to Defendant for damages arising from the breach. Plaintiffs respond that the releases may be used by Defendant as a shield to defend itself from suit, but not as a sword in initiating litigation, unless Plaintiffs brought their suit in bad faith.

This Court could not find any case law within the Eleventh Circuit concerning the use of an agreement not to sue in a release-of-liability form as the grounds for instituting a suit for damages upon its breach. Defendant directs the Court's attention to a decision from the Northern District of Texas in which a court found that the "breach of a release may be grounds for an action for damages." *Widener v. Arco Oil and Gas Co.,* 717 F.Supp. 1211, 1217 (N.D.Tex.1989) ("Because the purpose of entering into a release is to avoid litigation, the damages a releasor suffers when the release is breached are its costs and attorney's fees incurred in defending against the wrongfully brought action."). Plaintiffs, in turn, offer the Court a decision from the Central District of Illinois in which a court found that "unless a covenant not to sue expressly provides for damages in the event of breach, it will be presumed to be intended for *defensive* purposes only, absent allegation that the subsequent lawsuit was brought in bad faith." *Isaacs v. Caterpillar, Inc.,* 702 F.Supp. 711, 713 (C.D.Ill.1988) (emphasis in original) (citing *Artvale, Inc. v. Rugby Fabrics*

*Corp.,* 363 F.2d 1002, 1008 (2nd Cir.1966) (finding, in addition, that such a covenant does not subject a plaintiff to damages if the plaintiff is, *inter alia,* claiming in good faith that the agreement was obtained by unfair means)).

The Court finds that Plaintiffs brought their claims in the good faith belief that, *inter alia,* they were not bound by the releases because they had been signed unknowingly and involuntarily. As such, the *Isaacs* decision addresses the situation most like that before this Court. In light of this similarity and the persuasiveness of the *Isaacs* and *Artvale* courts' reasonings, this Court finds that Defendant may use the releases only as a shield, and not as a sword, and, thus, may not institute a suit for damages on account of their breach. The Court, therefore, grants Plaintiffs' Motion to Dismiss Defendant's Counterclaim.

## CONCLUSION

The Court GRANTS Plaintiff's Motion for Extension of Time, GRANTS Plaintiff's Motion to Dismiss, GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment, and GRANTS Defendant's Motion for Separate Trials on the questions of the validity of Holt's release and Holt's ADEA claim. Remaining before the Court is Plaintiff Holt's claim that Defendant terminated her in violation of ADEA.

So ORDERED.